[No. S056924. July 27, 1999.]

NBC SUBSIDIARY (KNBC-TV), INC., et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
SONDRA LOCKE et al., Real Parties in Interest.

1180

**COUNSEL**

Karlene W. Goller; Davis Wright Tremaine, Kelli L. Sager, Karen N. Frederiksen and Todd D. Thibodo for Petitioners the Los Angeles Times and California Community News.

Anne H. Egerton; Patricia Duncan; Williams & Connolly, Kevin T. Baine, Nicole K. Seligman and Craig D. Singer for Petitioner NBC Subsidiary (KNBC-TV), Inc.

Borton, Petrini & Conron and Tobias A. Dorsey for California Broadcasters Association as Amicus Curiae on behalf of Petitioners.

Levine Pierson Sullivan & Koch and James E. Grossberg for ABC, Inc., American Society of Newspaper Editors, Cable News Network, Inc., California Newspaper Publishers Association, CBS Inc., the Copley Press, Inc.,

the Hearst Corporation, Magazine Publishers of America, Inc., McClatchy Newspapers, Inc., National Association of Broadcasters, Newspaper Association of America, the New York Times Company, the Orange County Register, Press-Enterprise Company, the Reporters Committee for Freedom of the Press and the Washington Post as Amici Curiae on behalf of Petitioners.

De Witt W. Clinton and Lloyd W. Pellman, County Counsel, and Frederick R. Bennett, Assistant County Counsel, for Respondent.

Leah Saffian as Amicus Curiae on behalf of Respondent.

No appearance for Real Parties in Interest.

---

**OPINION**

**GEORGE, C. J.**—In a civil trial involving prominent figures in the entertainment industry, respondent Superior Court of Los Angeles County issued orders excluding the public and the press from all courtroom proceedings held outside the presence of the jury, and sealing the transcripts of those proceedings. The trial court thereafter held numerous closed courtroom proceedings during the first four days of trial after the jury was sworn. Subsequently, petitioners NBC Subsidiary (KNBC-TV), Inc. (hereafter KNBC), the Los Angeles Times, and California Community News sought and obtained from the Court of Appeal a writ of mandate, vacating the trial court's closure order on the ground that the findings of respondent court did not support blanket exclusion of the public and the press from all proceedings held outside the presence of the jury. For the reasons that follow, we affirm the judgment of the Court of Appeal.

As we shall explain, the United States Supreme Court and numerous unanimous lower courts have held that the First Amendment of the federal Constitution generally precludes closure of substantive courtroom proceedings in *criminal* cases unless a trial court provides notice to the public on the question of closure and after a hearing finds that (i) there exists an overriding interest supporting closure; (ii) there is a substantial probability that the interest will be prejudiced absent closure; (iii) the proposed closure is narrowly tailored to serve that overriding interest; and (iv) there is no less restrictive means of achieving that overriding interest. Under established principles of statutory interpretation, we must construe California's longstanding "open court" statute (Code of Civil Procedure section 124, hereafter section 124) consistently with these constitutional requirements, and applying section 124, as so construed, to ordinary *civil* proceedings, we conclude

that the trial court in this case failed to comply with these requirements. Accordingly, the trial court's closure order improperly denied the public and the press access to these proceedings, in violation of section 124. Although we recognize that the trial court reasonably was concerned with the risk that the jury in this highly publicized matter might learn of inadmissible evidence or information if the proceedings outside the presence of the jury were held in open court, recent decisions make clear that, as a general matter, frequent and specific cautionary admonitions to the jury and clear and direct instructions, rather than closure of the courtroom to the public, constitute the accepted, presumptively adequate, and typically less restrictive means of dealing with this potential problem.

I

Plaintiff Sondra Locke sued defendant Clint Eastwood for deceit, intentional interference with prospective economic advantage, and breach of fiduciary duty arising out of alleged promises by Eastwood to assist Locke in the development of motion picture projects.

Shortly after the jury was sworn, the trial court on September 10, 1996, issued on its own motion an oral order stating that "all proceedings in the case that are held outside the presence of the jury will be closed to the public and the press." Thereafter, on the morning of September 11, the court commenced a series of hearings held in the courtroom, from which the jury and the public—including the press—were excluded. These September 11 hearings concerned the permissible content of opening statements to the jury, the content of jury instructions, the scope of a subpoena and a witness's proposed testimony, and a stipulation by defendant. After counsel for plaintiff objected to the court's suggestion that a key piece of evidence should be withheld from the press, the court stated: "I want to put one thing on record but just to protect us all. The reason that this court is excluding anyone that is not a participant in this case, including the press or even any court watchers is to ensure that the only information that the press has is that what the jury sees and nothing else because I do not want to have a situation I have seen in other cases where the press reports something that was out of the presence of the jury and then, somehow, someone reads it. [¶] And for that reason, . . . I'm setting something a little different in this case. The press is entitled to what the jury is entitled to see, and I do not believe the press is entitled to see what the jury does not see to ensure a fair and impartial jury and to make sure the jury is unable to obtain information that is done out of the presence of the jury. [¶] The transcript is sealed. . . . [T]he only part of the transcript that is available to anyone outside of the . . . plaintiff or the defendant, is that which was before the jury, and everything else is sealed by this court order."

Subsequently, plaintiff made her opening statement to the jury, immediately after which the courtroom was cleared of the public and the press. Defendant then moved for a nonsuit and briefly argued the point, and the court took the matter under submission. Thereafter the courtroom was reopened and the defense made its opening statement to the jury, at the conclusion of which the courtroom again was cleared of the public and the press. The court discussed with the parties a proposed stipulation concerning another of plaintiff's witnesses, and the scheduling of that witness, and then mentioned that it would "have to call NBC" and that it would "put out a statement" setting forth its reasons for closing the courtroom to the public and the press when the jury was not present.

Thereafter, the court issued the following order: "The primary purpose of this court is that the litigants appear before a fair and impartial jury untainted by information obtained that was not presented to the jury. This jury is not sequestered, and to prevent the jury from hearing information regarding evidence that may not be presented to the jury or is not relevant to these proceeding[s], it is necessary that only the litigants and their attorneys be present during those discussions with the court. This court is available to everyone to hear all argument and evidence that is presented to the jury. This court has instructed the bailiff to clear the courtroom of everyone other than the litigants and their attorneys at every break and when the jury is not present."

The afternoon session of the trial commenced in the courtroom, out of the presence of the public and the press. The court again discussed with the parties the scope of proposed testimony and whether proposed witnesses were adverse and could be asked leading questions. Thereafter the public, the press, and the jury were admitted back into the courtroom for the testimony of plaintiff's first two witnesses. During a subsequent recess from which the public and the press were excluded from the courtroom, the court heard arguments concerning the permissible scope of testimony by plaintiff.

On Thursday, September 12, testimony by plaintiff resumed before the jury in open court. Prior to the close of her direct examination, but after the public, the press, and the jury were excluded from the courtroom, defendant moved for a mistrial on the ground that plaintiff's testimony addressed matters that were not in issue. After extended discussion, the court resolved to deal with defendant's concerns through instructions to the jury. Thereafter the court stated to the parties that it had amended the written order issued the previous day, to add the following penultimate sentence: "This court has insufficient room in chambers for litigants and counsel, so these proceedings in the absence of the jury are held in the courtroom as an extension of

chambers." The court also mentioned that it would meet with a representative of "NBC" at 1:30 p.m.

The hearing on petitioner KNBC's ex parte "Application to Vacate Closure Order" apparently was held in the closed courtroom without the presence of the parties, the public, or the press; only counsel for KNBC, the judge, and a court reporter were present. Petitioner KNBC asserted in its moving papers that the trial court's closure order violated the First Amendment of the United States Constitution and article I, section 2 of the California Constitution. The court began by asking petitioner's then counsel, Kelli L. Sager, whether she had received "the latest revised [order]" containing "the extra sentence." Counsel confirmed that she had seen it, and asserted that she assumed from the orders that "substantive issues" were being discussed and resolved in closed sessions, and that "whether or not the court was going to hold [those hearings] in chambers or in the courtroom ['as an extension of chambers'] does not matter in terms of the public's right of access." The court repeated its "paramount concern" for a "fair and impartial jury," and stressed that the transcripts of the closed proceedings "will be made available to the media at the close of the case." The court asserted, "the only way to *make sure* that the jury does not hear through the media the items that are going to be excluded from the jury is to make sure that that's outside the presence of the jury and outside the presence of the media." (Italics added.)[1] In the trial court's view, petitioner sought to vindicate a First Amendment right to "dissemination of information for commercial exploitation" against a greater right of "litigants in a court to have a fair and impartial jury to make sure that information does not come to them when they are either deliberating or on [the] way home or in the supermarket looking at magazines, to hear information which would . . . [deprive the litigants of] a fair and impartial jury which is the bulwark of our Constitution."

Counsel for KNBC, alluding to the cases cited in her motion briefs, asserted, "this is not a new topic. This issue has come up repeatedly in cases . . . ." The court responded: "As you know, certain things have happened in the past couple of years that have put a whole new light on protecting juries . . . ."[2] The court continued: "I believe it is necessary that these other proceedings are held out of the presence of the jury because [they deal] with information relating to evidence; to witnesses; to what is going to be

---

[1] Immediately thereafter, the court again stressed that "the media can't *ensure* that that information will not be disseminated to the jury." (Italics added.)

[2] The court later repeated that "so much has changed in the past few years," and that "the cases you have cited are not that recent anymore, and I think the recent change of events and the way that the cases are handled in the media, I have a duty to protect this jury and protect the rights of the litigants."

excluded [from] the jurors; and in this case, because it's a higher profile case, the fact that the information, unlike other cases, all the information is being disseminated in the news media. [¶] This is the type of information that ends up in tabloids, that faces everybody that walks . . . into a grocery store to buy their groceries. It's on television. It's in the newspapers. It's on radio. And to *ensure* that the jurors do not hear this even by accident or that their spouse does not hear it and question the jurors since they're not sequestered, this is a very, very small intrusion on the First Amendment, and in essence it's not an intrusion on the First Amendment. It is a slight delay." (Italics added.) When prompted by counsel for KNBC to consider alternatives to its closure orders, the court asked what alternatives were available. Counsel mentioned sequestration, which the court rejected as too costly and, in any event, "detrimental in many cases." The court concluded that it was "obligated to protect the rights of these two litigants," and that the closure order would stand.

Trial before the jury in the open courtroom resumed. After further testimony by plaintiff, the court called a recess and excluded the public and the press from the courtroom. The court considered the proposed testimony of one of plaintiff's witnesses and ruled it irrelevant and inadmissible. The court considered arguments relating to an offer of proof concerning proposed reputation evidence by another of plaintiff's witnesses, and eventually held a hearing and heard testimony of the proposed witness pursuant to Evidence Code section 402, which permits a court to hold a hearing on "foundational and other preliminary facts," "out of the presence or hearing of the jury." (*Id.*, subd. (b).)[3] Finally, after considering the proposed witness's testimony and after discussion with the parties, the court concluded that the proffered reputation evidence would not be allowed. Immediately thereafter, the court held a second closed hearing pursuant to Evidence Code section 402, concerning the proposed testimony of yet another of plaintiff's witnesses. After hearing the proposed testimony and considering the parties' arguments, the court ruled that the witness would be permitted to testify concerning limited matters. Proceedings subsequently resumed in open court, with the witness testifying before the jury.

After the jury was excused for the day, the court held further closed hearings in the courtroom, concerning (i) the admissibility of various letters, (ii) additional witnesses for plaintiff who proposed to testify regarding plaintiff's reputation and plaintiff's "career damage," and (iii) a proposed stipulation.

---

[3]During the course of the Evidence Code section 402 hearing, the court, in response to an evidentiary objection by defendant, explained that the hearing under section 402 was "like a preliminary hearing."

On Friday, September 13, 1996, petitioners filed a petition for "alternative and peremptory writs of mandamus, prohibition, and review" in the Court of Appeal, challenging the trial court's September 12, 1996, closure order. The petition asserted that the trial court had made inadequate findings to support the blanket closure of all proceedings conducted outside the presence of the jury, and sought an order directing the trial court to vacate its closure order and immediately make available the transcripts of all proceedings that had been closed to the public and the press. On the same date, the Court of Appeal directed the trial court to file a preliminary response "addressing the question of why more narrowly tailored alternatives to barring complete public and media access to proceedings where the jury is not present are [not] appropriate given the holding of *Press-Enterprise Co.* v. *Superior Court* (1986) 478 U.S. 1, 13-15 [106 S.Ct. 2735, 2742-2744, 92 L.Ed.2d 1]. The response may be filed via facsimile transmission by 4:30 p.m. on [Monday,] September 16, 1996."

On Monday morning, September 16, 1996, the trial judge issued a third revised order that it read in open court, in the presence of the public and the press, but outside the presence of the jury. This revised order tracked the revised order of September 12, and added the following: "The First Amendment of the Constitution provides for the protection of the press. The Sixth Amendment establishes the right to an impartial jury trial in criminal matters and the Seventh Amendment provides for the right of a jury trial in civil cases. The First, Sixth, and Seventh Amendments are bulwarks to our Constitution. Each is entitled to equal dignity. One must not destroy the others." Thereafter, the public and the press were ushered out of the courtroom, and closed proceedings resumed concerning plaintiff's proffered introduction of a business record. Over plaintiff's assertion that the document was "essential" to her case, the court denied admission but left open the possibility of addressing the matter through stipulation or jury instructions. In the course of the hearing, counsel for defendant mentioned that he "appreciate[d] what the court has stated about the jury being excluded from extraneous information," at which point the court stated: "I'm only interfering for one thing. . . . We have had [Evidence Code section] 402 hearings where a person makes an unsubstantiated statement that borders on slander. That would be unbelievably prejudicial to a jury, and we would know that that would come out in every one of the tabloids. . . . [¶] . . . [A]s I told counsel for NBC, we don't have the money to sequester juries. . . . And it's not fair to the litigants, not fair to Ms. Locke if anything is said about Ms. Locke, [it's] not fair to Eastwood if anything is said about Mr. Eastwood

outside the presence of the jury."[4] Counsel for defendant agreed, and stressed the need to continually admonish the jury to avoid news accounts of the case. The court commented that the "law has always been a few steps behind technology. . . . [Y]ou didn't have such instant access years ago. There was always a certain amount of delay, and [now] there's no protection for litigants, and this is not right."

Trial resumed in open court with a witness who testified for plaintiff concerning "career damage." Prior to redirect examination of that witness, the court held a closed hearing concerning defendant's motion to introduce evidence to rebut the witness's testimony. After hearing argument, the court ruled the evidence admissible in part. Trial resumed in open court with the witness's rebuttal testimony and the very brief direct testimony of defendant.

After the noon recess, defendant renewed his motion for a nonsuit. Defense counsel immediately was interrupted by the court clerk, who observed that the bailiff was still in the process of "clearing the courtroom." Thereafter, in the closed courtroom, defense counsel argued the motion, which constituted an analysis and critique of the evidence presented in open court by plaintiff. Counsel for plaintiff offered her rebuttal argument, which constituted her own analysis and commentary upon the evidence presented in open court. The trial judge took the matter under submission. Back in open court with the jury present, defendant presented his first two witnesses, and then court was adjourned for the day.

Later that afternoon, the Court of Appeal considered respondent court's preliminary response to the petition for writ of mandate, and issued an order directing respondent to show cause why the relief prayed for by petitioners should not be granted. It set the matter for oral argument at 5:00 p.m. the following day, Tuesday, September 17, 1996.

On Tuesday, September 17, trial resumed in open court with defendant testifying before the jury. During a recess in which the jury, the public, and the press were excluded from the courtroom, the court heard objections from defense counsel concerning assertedly improper "body language" of counsel for the plaintiff, heard arguments concerning (and then determined) the scope of "state of mind" testimony that defendant would be allowed to introduce relating to a legal proceeding concerning collateral litigation with

---

[4]Counsel for defendant immediately observed: "It's in the papers already. If you read today's L.A. Times, it has the stuff about . . . [plaintiff] . . . accusing him of forcing [her] to have an abortion, which is a lie." Counsel also mentioned that the cited news story was "above the fold on the front page of the Valley Edition" and that "[i]t was on NBC."

plaintiff, and heard a report from the bailiff, who recounted a tip from a reporter who advised that someone in the courtroom audience had smuggled a camera into the courtroom. Thereafter, the jury, the public, and the press were readmitted into the courtroom, and testimony before the jury resumed.

After plaintiff's cross-examination of defendant, the court excused the jury for lunch and cleared the courtroom, whereupon defendant moved for a mistrial based on questions about telephone tapping that had been asked on cross-examination, allegedly in violation of an earlier *in limine* ruling. The court denied the motion, commenting that it would "clear this up in the instructions." In the afternoon, defendant completed his testimony, and two additional defense witnesses testified, all in open court before the jury, the public and the press. Thereafter, the jury was excused for the day, and the courtroom was cleared of the public and the press, at which time the parties discussed with the court various questions concerning the admissibility of evidence, deferred rulings, proposed stipulations, and the mechanics of submitting to the court the proposed jury instructions.

At 5:00 p.m. that day (September 17), oral argument was held before the Court of Appeal on the writ petition. On the same date, shortly after oral argument, the court issued its peremptory writ of mandate, directing the trial court to vacate its September 12, 1996, closure order as being based upon insufficient findings and hence inconsistent with the First Amendment. It further ordered, "[a]s to any proceedings that have been the subject of closed proceedings to date, transcripts of those hearings are to be made available to the public or journalists unless the respondent court makes findings that comply with *Waller* [v. *Georgia* (1984) 467 U.S. 39 [104 S.Ct. 2210, 81 L.Ed.2d 31]]. The respondent court retains jurisdiction to enter closure orders as to any proceedings so long as they comply with *Waller* and the First Amendment."

Trial resumed, and testimony was concluded, on Wednesday, September 18, 1996. The morning session began in open court, with the jury, the public, and the press present, at which point the trial judge advised the jury that he would go with the parties into chambers in order to address a "procedural motion." In chambers, defense counsel moved to present as its own expert a witness whom it originally had designated solely as a rebuttal witness. The court then stated "for the record to comply with the writ" that "this is a procedural matter"—but it made no finding concerning why the motion needed to be heard in chambers, outside the presence of the public and the press. The court proceeded to hear in chambers extensive legal and factual arguments from both parties concerning defendant's designation of the proposed witness as an expert witness, and then ruled that the witness would

be allowed to testify. Thereafter the court considered in chambers whether defendant would be permitted to present a witness to testify concerning accounting matters relating to sums paid to the plaintiff by Warner Brothers, and, after considering arguments from both parties, the court deferred ruling on the matter.

Testimony by witnesses for defendant resumed in open court before the jury in the presence of the public and the press. Shortly thereafter, the court and the parties returned to chambers and resumed discussion of the proposed testimony and records relating to accounting matters. After extensive arguments addressing, among other things, whether the jury would be advised of asserted connections between payments to plaintiff and the motion picture UNFORGIVEN (Warner Bros. 1992), the court ruled that the records could be introduced and redacted to remove references to that motion picture. On another matter, the parties agreed to stipulate in court to the reading of another witness's deposition testimony. Trial resumed in the open courtroom, at which time the deposition testimony was read into evidence, and proceedings were recessed over the noon hour.

Thereafter trial continued with plaintiff testifying in open court. The defense then rested and the jury was excused for the day. The trial judge and the parties proceeded in open court to address the admissibility of exhibits, as well as jury instructions. Apparently, however, no member of the media or the public was present in the courtroom at that time, and the court instructed the bailiff to "go out into the hallway and see if there's any press that are out there." The bailiff did so and reported that there was "no one out there," at which point the court commented, "we complied with the Court of Appeal ruling and this is an open court, and all of the discussions are done in an open court for anybody to come in, and nobody wanted to come. We gave an invitation and nobody came. And it's 3:26 and nobody is there, and the doors are unlocked. So there."

The parties proceeded to address, argue, and object to, numerous exhibits, and the court made rulings on their introduction. Thereafter defendant moved for a directed verdict and argued the motion. After hearing plaintiff's arguments in response and defendant's rebuttal, the court took the matter under submission and turned to the jury instructions. Toward the conclusion of that extensive process, the court again asked the bailiff whether there was "[a]nybody out there" (apparently referring to the hallway), and the bailiff responded that there was not. The court briefly discussed with the parties the scope of closing argument and recessed for the day.

On Thursday, September 19, immediately before the jury was to hear closing arguments, the court retired briefly into chambers with the parties to

discuss unresolved questions concerning the jury instructions. Thereafter, plaintiff delivered her closing argument to the jury. The jury was excused from the open courtroom while the court and the parties discussed and resolved more questions concerning the jury instructions, after which the jury returned to the open courtroom for defendant's closing argument. There followed a discussion—apparently outside the presence of the jury, but presumably in the open courtroom—concerning defendant's objections to statements in plaintiff's closing arguments, and related jury instructions. Then, after a recess, the court held a final hearing in open court, outside the presence of the jury, to resolve a final jury instruction issue related to plaintiff's closing argument. The court instructed the jury, which immediately commenced deliberations. The court then discussed with the parties the jury's future deliberation schedule and established a procedure for contacting counsel upon return of the anticipated verdict.

The record before us concludes at this point.[5]

## II

■ We granted review to address "whether there is a constitutional right of public access to civil trials." After examining the briefs and conducting independent research, however, we discovered a statute of apparent relevance—Code of Civil Procedure section 124—that had not been raised or mentioned by the parties. ■ ■ Mindful of the prudential rule of judicial restraint that counsels against rendering a decision on constitutional grounds if a statutory basis for resolution exists (see, e.g., *Ashwander* v. *Valley Authority* (1936) 297 U.S. 288, 347 [56 S.Ct. 466, 483, 80 L.Ed. 688] (conc. opn. of Brandeis, J.)), we amended our specification of issues to include a preliminary additional issue: Does the trial court's exclusion order in this case violate section 124? We solicited supplemental briefs on that issue, requesting the parties to address the history of section 124, and any relevant out-of-state case law interpreting statutes similar to section 124. We thus turn initially to section 124.[6]

---

[5]We are informed by the briefs that the case settled some five calendar days later—on the morning of September 24, 1996—while the jury was deliberating.

[6]As a preliminary matter, we address the question of justiciability. As noted, the underlying trial proceedings have terminated. (See *ante*, fn. 5.) Nonetheless, as scores of other reviewing courts in this same posture have concluded, we determine that although the present case is technically moot, it presents an important question affecting the public interest that is " ' "capable of repetition, yet evading review." ' " (*Press-Enterprise Co.* v. *Superior Court* (1986) 478 U.S. 1, 6 [106 S.Ct. 2735, 2739, 92 L.Ed.2d 1].) Accordingly, our resolution of the case at this juncture is appropriate.

A

Section 124, which reads in substance as it did when enacted in 1872, states in full: "Except as provided in Section 214 of the Family Code or any other provision of law, the sittings of every court shall be public."[7]

Petitioners observe that the underlying litigation in the present matter did not concern proceedings under the Family Code, and they assert that in view of the express language of section 124, and the cases that have applied the section, the trial court's closure order violated the statute. Respondent, citing treatises of the late 19th and early 20th centuries, as well as California case law, maintains that section 124 was not intended, and has not been interpreted, to intrude upon a trial court's discretion to close proceedings held outside the presence of a jury in order to protect the right of civil litigants to a fair trial. As explained below, although it is not clear from the language and history of section 124, standing alone, whether the order here at issue violated the statute, our interpretation of section 124 properly must be guided not only by our statute's language and history, but also by the

---

[7]In their supplemental briefs, both petitioners and respondent have presented appendices containing authenticated documents disclosing the history of section 124 and photocopies of related secondary material (primarily treatises) addressing section 124 and related statutes and issues. Prior to oral argument, we granted the parties' respective motions to take judicial notice of this material. (See generally, Evid. Code, § 450.)

The substance of section 124 and Family Code section 214 was derived from Statutes of 1863, chapter 260, "An Act concerning the Courts of Justice of this State and Judicial Officers," section 63 of which provided: "The sittings of every Court of Justice shall be public, except as is provided in the next session [*sic*: section]." (Stats. 1863, ch. 260, § 63, p. 342.) Section 64 of the 1863 act provided: "In an action for divorce, the Court may direct the trial of any issue of fact joined therein to be private; and upon such directions all persons may be excluded, except the officers of the Court, the parties, their witnesses, and Counsel." (Stats. 1863, ch. 260, § 64, p. 342.)

As codified in 1872, section 124 read: "The sittings of every Court of justice are public, except as provided in the next section." (Enacted 1872.) The "next section" (section 125) embodied in substance that which was contained in section 64 of the 1863 act. As amended in 1880, section 124 read: "The sittings of every Court of justice shall be public, except as provided in the next section." (Acts Amendatory of the Codes of Cal. (1880) Amends. to Code Civ. Proc., ch. 35, p. 36.) Also in 1880, section 125 was amended to read as follows: "In an action for divorce, criminal conversation, seduction, or breach of promise of marriage, the Court may direct the trial of any issue of fact joined therein to be private, and may exclude all persons except the officers of the Court, the parties, their witnesses, and counsel . . . ." (Acts Amendatory of the Codes of Cal., *supra,* at pp. 36-37.) Thereafter references to "criminal conversation" and "breach of promise of marriage" were omitted in 1939, and the substance of section 125 was enacted in 1969 as former Civil Code section 4519, and in 1970 as former Civil Code section 4360. Operative in 1994, Family Code section 214 now states in full: "Except as otherwise provided in this code or by court rule, the court may, when it considers it necessary in the interests of justice and the persons involved, direct the trial of any issue of fact joined in a proceeding under this code to be private, and may exclude all persons except the officers of the court, the parties, their witnesses, and counsel."

relevant constitutional principles, relating to public access to court proceedings, that more recently have been articulated by the United States Supreme Court. Accordingly, we conclude that it is necessary and appropriate to consider the constitutional issue set out in our initial order granting review.

In part II B of this opinion, we discuss the rather sparse case law relating to section 124. In part II C we describe the relevant First Amendment case law. Finally, in part III we apply section 124, as it must be construed under the First Amendment, to the closure order in this case.

B

Few cases have mentioned, and even fewer have analyzed or construed, section 124.[8] A late-19th-century case, *People v. Hartman* (1894) 103 Cal. 242 [37 P. 153] (*Hartman*), concerned a criminal trial for assault with intent to commit rape. Although the defendant asserted section 124 as a basis for a finding of error in the closing of his trial, our opinion reversing the resulting judgment of guilt focused primarily on the defendant's meritorious claim that closure violated his *constitutional* right to a public trial. Still, the opinion provides some insight concerning the discretion that reviewing courts at that time were willing to grant to trial courts charged with the responsibility of conducting a "public" trial. In the course of our opinion, we quoted with approval Judge Cooley's treatise, Constitutional Limitations (4th ed. 1878) at page 383, to the effect that " '[t]he requirement of a public trial is . . . fairly observed if, without partiality or favoritism, a reasonable proportion of the public is suffered to attend, *notwithstanding that those persons whose presence could be of no service to the accused, and who would only be drawn hither by a prurient curiosity, are excluded altogether.*' " (*Hartman, supra,* 103 Cal. 242, 244, italics added.) Thereafter the court in *Hartman* stated: "The doors of the courtroom are expected to be kept open, the public are entitled to be admitted, and the trial is to be public in all respects, . . . with due regard to the size of the courtroom, *the conveniences of the court,* the right to exclude objectionable characters and youth of tender years, *and to do other things which may facilitate the proper conduct of the trial.*" (*Id.,* at p. 245, italics added.)

---

[8]We reject at the outset respondent's undeveloped suggestion that section 124 may have been intended to apply to criminal cases only, and not to civil cases. Nothing in the language of the statute or in its history supports such a construction. In particular, the statutory exception relating to proceedings under the Family Code is wholly inconsistent with any suggestion that section 124 itself was not intended, in general, to apply to civil cases.

For the next 62 years, no other California case that we have found or that the parties have addressed discussed section 124.[9] Some practice guides and treatises, however, continued to emphasize the generally broad discretion of trial judges to exclude the public from, or to close, courtrooms. For example, in Hayne, A Treatise on New Trial and Appeal (1912) section 34a, page 199, the author addressed the related issue of state constitutional provisions granting a right to a public trial, and, citing this court's decision in *Hartman, supra,* 103 Cal. 242, noted that the right is subject to, among other things, "the conveniences of the court" and the court's authority "to do all things that may facilitate the proper conduct of the trial." Similarly, in Bowers, The Judicial Discretion of Trial Courts (1931) section 262, pages 296 to 297, the author observed that some statutes expressly confer on trial courts authority to exclude the public in certain defined circumstances, but asserted that those statutes are merely "declaratory of authority inhering in the court" (*id.,* at p. 297), and that the essential power of a trial court to exclude the public from "the courtroom during trial . . . is a matter to be determined by the trial court in the exercise of administrative functions which are essentially executive in character. Because of the wide variations in the circumstances which may invoke the discretionary action of the court in limiting the attendance of the public, it is not possible to assign the adjudications upon the subject to any rule more particular than that just stated." (*Id.,* at p. 296.)

1

The leading opinion construing and applying section 124 was decided more than 40 years ago. (*Kirstowsky* v. *Superior Court* (1956) 143 Cal.App.2d 745 [300 P.2d 163] (*Kirstowsky*).) The defendant in *Kirstowsky* was on trial for murder. On the first day of trial, in an ex parte hearing, defense counsel advised the trial judge that because his client's testimony would concern embarrassing "abnormal sexual practices" that had been "enforced upon her," and because she was experiencing extreme emotional disturbance, she would be unable to testify on her own behalf unless she could do so in a courtroom closed to the public and the press. (*Kirstowsky, supra,* 143 Cal.App.2d at p. 748.) The trial court, "in the exercise of its

[9] *In re Shortridge* (1893) 99 Cal. 526 [34 P. 227] (*Shortridge*), which involved a contempt order issued against a newspaper publisher for publishing testimony from a marital dissolution proceeding that had been closed to the public—a case relied upon by both parties—did not address or discuss section 124. The same is true of *People* v. *Swafford* (1884) 65 Cal. 223 [3 P. 809], and *People* v. *Kerrigan* (1887) 73 Cal. 222 [14 P. 849], relied upon by respondent. Still other cases that have mentioned section 124 did so in passing only, and shed no light on the proper interpretation of the section. (E.g., *Swars* v. *Council of City of Vallejo* (1949) 33 Cal.2d 867 [206 P.2d 355] [section 124 is inapplicable to administrative adjudication proceedings]; *Cembrook* v. *Sterling Drug Inc.* (1964) 231 Cal.App.2d 52 [41 Cal.Rptr. 492] [section 124 does not require the press to publicize trials].)

discretion"—and believing that a public trial would violate the defendant's right to a fair trial, granted the motion and closed the entire trial to the public and the press. (*Ibid.*)

As in the present case, the press sought a writ of mandate to compel the trial court to vacate its closure order, asserting a public right of access to the trial based upon "three grounds: (1) common law, (2) statute [section 124] and (3) a determination that the constitutional guarantee of a public trial to an accused was intended to include the common law right of the public." (*Kirstowsky, supra,* 143 Cal.App.2d at p. 749.) After briefly surveying the common law on this point (*id.,* at p. 750) and quoting both section 124 and the predecessor to Family Code section 214,[10] the reviewing court stated: "We are satisfied that both at common law and under our statutory law trials are intended to be public and open to the public with such exceptions as are specifically set forth in statutes, or under certain circumstances to which we will refer hereinafter." (*Kirstowsky, supra,* 143 Cal.App.2d at p. 750.)

The court recognized in *Kirstowsky* that it faced an issue of first impression: "The right of the public to attend criminal trials has not been directly presented to our California courts and the decisions which discuss the concept of a public trial have been appeals in which defendants have appealed from their convictions upon the ground that they had been denied a public trial." (*Kirstowsky, supra,* 143 Cal.App.2d at p. 751.) After quoting *Hartman, supra,* 103 Cal. 242, 245, for the proposition that, insofar as the defendant's right to a public trial is concerned, the right is subject to the " 'conveniences of the court' " and the trial court's power " 'to do other things which may facilitate the proper conduct of the trial' " (*Kirstowsky, supra,* 143 Cal.App.2d at p. 751), *Kirstowsky* proceeded to address the respondent court's assertion that the constitutional public trial right, and the common law and statutory rights, belonged to the litigant only and could not be asserted by the public or the press. (*Id.,* at p. 752.) The court rejected this narrow approach insofar as it applied to the petitioners' common law and section 124 claims to a right of access, finding that "[t]he right of the public to attend sessions of the court is too well established by the common law and by our statutory law to permit the exclusion of the public except in cases provided for by statutes, *or under circumstances which make it a proper exercise of the court's discretion in order to accord the defendant a fair trial.*"

---

[10]As observed *ante,* footnote 7, at the time of *Kirstowsky, supra,* 143 Cal.App.2d 745, section 124 read as follows: "The sittings of every Court of justice shall be public, except as provided in the next section." Section 125, the predecessor to Family Code section 214, read as follows: "In an action for divorce or seduction, the court may direct the trial of any issue of fact joined therein to be private, and may exclude all persons except the officers of the court, the parties, their witnesses, and counsel . . . ." (Stats. 1939, ch. 129, § 1, pp. 1245-1246.)

(143 Cal.App.2d at p. 752, italics added.) Explicating the latter point, the court added: "Neither do we agree with the contention of the petitioners . . . that, except in the instances specifically enumerated in the statutes, there can be no total exclusion of the public from all or any part of the court sessions." (*Ibid.*) *Kirstowsky* held that although section 124 did not specifically authorize closure as necessary to guarantee a fair trial, the trial court had both a duty to ensure a fair trial and " 'inherent and implied powers' " (143 Cal.App.2d at p. 753) to effectuate that right. Accordingly, "[t]he provisions of section 124 . . . that the sittings of every court of justice shall be public must be subordinated to the higher right and duty of the court under the Constitution to see to it that the defendant receives a fair trial and has a fair opportunity to present his or her defense." (*Ibid.*)

The appellate court observed in *Kirstowsky* that, under the facts known to the trial court, an order excluding the public during the defendant's testimony would have been within the "inherent power" and sound discretion of the trial court. (*Kirstowsky, supra,* 143 Cal.App.2d at pp. 753-754.) It found, however, that the trial court's sweeping order closing the entire trial was overbroad and violated section 124: "If in the exercise of its discretion the court believed that defendant, because of emotional disturbance, would not be able to testify freely and completely if the public were not excluded during her testimony, it was within the discretion of the court to exclude the public during the time she was upon the witness stand, but in view of the statutory provision that the sittings of every court of justice shall be public, we think the court went too far in making its exclusion order effective as soon as the taking of testimony was begun and continuing it throughout the entire trial." (143 Cal.App.2d at p. 754.)[11]

---

[11]The only other case to mention section 124 is the recent decision in *In re Marriage of Lechowick* (1998) 65 Cal.App.4th 1406 [77 Cal.Rptr.2d 395] (*Lechowick*). There—purportedly under the authority of Family Code section 214, which as noted above permits closure of proceedings held under the Family Code "when . . . necessary in the interests of justice and the persons involved" (see *ante,* fn. 7)—the trial court closed proceedings and sealed court files concerning a marital dissolution involving a superior court judge. Petitioner, a journalist, unsuccessfully moved the trial court to unseal the documents and open any further proceedings. On appeal, the reviewing court reversed the lower court's ruling both as to unsealing and closure, and quoted section 124 in the course of explaining that Family Code section 214 does not authorize the sealing of court files. (65 Cal.App.4th at pp. 1411-1414.)

The *Lechowick* opinion then provided "specific guidance to the trial court on remand" concerning, among other things, the closure of future hearings: "[Family Code] section 214 provides authority under which a court may order some proceedings before it closed to the public, including the press. With respect to any future court proceedings in this case, respondent . . . is free to move for such an order pursuant to [Family Code] section 214. However, . . . we think it plain that a [Family Code] section 214 order must pertain to the trial of one or more particular 'issue[s] of fact' and be justified by a showing of particularized need by the moving party." (*Lechowick, supra,* 65 Cal.App.4th at pp. 1414-1415.) *Lechowick*

2

As observed, section 124 states that, with exceptions for proceedings under the Family Code "or any other provision of law," the "sittings of every court shall be public." It is not clear from the language of section 124 and the few cases interpreting that statute whether section 124, standing alone, should be construed to preclude a trial court from excluding the public from the portions of a civil trial that are held outside a jury's presence, when, as here, the court reasonably believes there is a strong likelihood that such proceedings will be widely publicized and might come to the attention of the jurors and jeopardize the litigants' right to a fair trial.[12]

---

sheds little light on the proper interpretation of section 124, and, as explained in part II C, its description of closure requirements fails to take into account rules of procedure and substance set out in the post-*Kirstowsky* cases construing the First Amendment in a similar context.

[12]As explained below, we believe, as held by *Kirstowsky, supra,* 143 Cal.App.2d 745, in the context of *criminal* proceedings, that section 124 permits an exception in *civil* cases when closure is necessary in order to guarantee a fair trial. Accordingly, we need not address respondent's suggestion that Code of Civil Procedure section 128, subdivision (a)(5), which confirms the power of every court "[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto," applies here and brings this case within the "any other provision of law" exception set out in section 124. We note, however, that respondent does not cite, and we are unaware of, any case holding that, pursuant to section 128—and without any showing of a threat to decorum—the public may be excluded generally from all proceedings held outside the presence of the jury, as occurred in the underlying trial.

On a related point, respondent cites Code of Civil Procedure section 166 (which, like section 124, was adopted in 1872) and its federal analogue, Federal Rules of Civil Procedure, rule 77(b) (28 U.S.C.). As amended, Code of Civil Procedure section 166, subdivision (a)(1)-(5), provides that trial judges "may, in chambers . . . [¶] (1) [Issue various] orders and writs . . . upon an ex parte application," and make various appointments and orders "in matters of probate. [¶] (2) Hear and determine all motions made pursuant to Section 657 [motion for new trial] or 663 [motion to set aside judgment]. [¶] (3) Hear and determine all uncontested actions, proceedings, [etc.] . . . other than actions for dissolution of marriage, [etc.]. . . . [¶] (4) Hear and determine motions to tax costs of enforcing a judgment. [¶] (5) Approve bonds and undertakings." Respondent does not propose, and we are unaware of any case suggesting, that the various closed proceedings in the underlying trial fall within the ambit of section 166. (See, e.g., 2 Witkin, Cal. Procedure (4th ed. 1996) Courts, §§ 27, 29, pp. 52-53, 54-55.) In any event, the federal constitutional considerations discussed in part II C of this opinion would apply to the provisions of section 166 as well as to the provisions of section 124.

Federal Rules of Civil Procedure, rule 77(b) (28 U.S.C.), which is similar to but broader than Code of Civil Procedure section 166, provides that "[a]ll trials upon the merits shall be conducted in open court and so far as convenient in a regular court room. All other acts or proceedings may be done or conducted by a judge in chambers, without the attendance of the clerk or other court officials . . . ." As explained below in part II C, federal courts have recognized a First Amendment right of access to the type of civil proceedings closed in the underlying trial, and we are unaware of any case that has approved, under the authority of rule

As we shall explain, however, recent federal cases shed considerable light on the constitutional considerations that bear upon the question of the appropriate interpretation and application of the statute. ■ It is well established that, if reasonably possible, statutory provisions should be interpreted in a manner that avoids serious constitutional questions. (*People* v. *Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 509 [53 Cal.Rptr.2d 789, 917 P.2d 628] (hereafter *Romero*); see also *Press-Enterprise Co.* v. *Superior Court, supra,* 478 U.S. 1, 13-14 [106 S.Ct. 2735, 2742-2743].) ■ Petitioners maintain that if the general language of section 124 were interpreted to afford a trial court broad discretion to exclude the public from the portions of the trial here at issue, the statute would be subject to serious constitutional challenge. We therefore examine the relevant federal constitutional precedents in considering the proper interpretation of section 124.

### C

We review the relevant high court cases (most of which arose in the criminal context) and a number of lower court decisions in civil cases—federal and state—concerning the asserted First Amendment right of access to trial proceedings.[13]

### 1

A celebrated dictum in a number of high court cases declares broadly that "[a] trial is a public event" and that "[w]hat transpires in the court room is public property." (*Craig* v. *Harney* (1947) 331 U.S. 367, 374 [67 S.Ct. 1249, 1254, 91 L.Ed. 1546]; see also *In re Oliver* (1948) 333 U.S. 257, 266, 272 &

---

77(b), the holding, in chambers or in a closed courtroom, of proceedings such as were closed below.

[13]Petitioners assert that the California Constitution also should inform our interpretation of section 124 and limit the circumstances under which a trial court has discretion to exclude the public from portions of court proceedings. As explained below, however, the United States Supreme Court has spoken to the issue in related cases concerning public access to criminal trials and found that a right of access in such cases is implied in the federal Constitution. Further, numerous lower federal and state court decisions have addressed and found a First Amendment right of access to civil proceedings. Past California decisions have not interpreted the state Constitution as providing an equally extensive right of public access to court proceedings, even in criminal cases (see *Press-Enterprise Co.* v. *Superior Court* (1984) 37 Cal.3d 772, 775-777 [209 Cal.Rptr. 360, 691 P.2d 1026], overruled on federal constitutional grounds in *Press-Enterprise Co.* v. *Superior Court, supra,* 478 U.S. 1, 13-15 [106 S.Ct. 2735, 2742-2744]). We believe it is appropriate, therefore, to address petitioners' federal constitutional arguments before deciding whether it is necessary also to address petitioners' contentions under the state Constitution. (Cf. *Loder* v. *City of Glendale* (1997) 14 Cal.4th 846, 866 [59 Cal.Rptr.2d 696, 927 P.2d 1200] (lead opn.).)

fn. 29 [68 S.Ct. 499, 504, 507, 92 L.Ed. 682].)[14] Nevertheless, in response to the growing problem of prejudicial publicity in criminal cases (see, e.g., *Sheppard* v. *Maxwell* (1966) 384 U.S. 333 [86 S.Ct. 1507, 16 L.Ed.2d 600]),[15] an exhaustive 1968 report by the American Bar Association recommended that under certain circumstances, courts should exclude "the public from hearings or arguments outside the presence of the jury" in criminal cases.[16] Subsequently, the high court stated in *Nebraska Press Assn.* v. *Stuart* (1976) 427 U.S. 539, 568 [96 S.Ct. 2791, 2807, 49 L.Ed.2d 683] (*Nebraska Press*), that closure of a preliminary hearing is an appropriate alternative to other proposed restrictions on the public and the press. A few years later the high court in *Gannett Co.* v. *DePasquale* (1979) 443 U.S. 368 [99 S.Ct. 2898, 61 L.Ed.2d 608] (*Gannett*) rejected a newspaper's constitutional

---

[14]Similar general statements have been made in notable state court civil cases. In *Cowley* v. *Pulsifer* (1884) 137 Mass. 392, 394 [50 Am.Rep. 318], Justice Oliver Wendell Holmes wrote that public access to civil judicial proceedings was "of vast importance" because of "the security which publicity gives for the proper administration of justice. . . . It is desirable that the trial of [civil] causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed." Consistently, in *Shortridge, supra,* 99 Cal. 526, 530-531, this court wrote that "[i]n this country it is a first principle that the people have the right to know what is done in their courts. The old theory of government which invested royalty with an assumed perfection, precluding the possibility of wrong and denying the right to discuss its conduct of public affairs, is opposed to the genius of our institutions in which the sovereign will of the people is the paramount idea; and the greatest publicity to the acts of those holding positions of public trust, and the greatest freedom in the discussion of the proceedings of public tribunals that is consistent with truth and decency are regarded as essential to the public welfare." (In *Shortridge,* the marital dissolution proceedings at issue had been closed, and this court's decision did not question the propriety of that closure; the sole question before the court was whether a publisher properly could be held in contempt of court for accurately reporting what had occurred in the closed proceedings. The court in *Shortridge* held that the publisher could not be held in contempt for such publication.)

[15]In *Sheppard,* the high court wrote that the "principle that justice cannot survive behind walls of silence has long been reflected in the 'Anglo-American distrust of secret trials.' " (384 U.S. at p. 349 [86 S.Ct. at p. 1515].) The court also cautioned, however, that in light of "increasingly prevalent" unfair and prejudicial news coverage in criminal cases, trial courts should undertake "strong measures to . . . prevent the prejudice at its inception" (*id.,* at pp. 362-363 [86 S.Ct. at p. 1522]), and that "the presence of the press at judicial proceedings must be limited when it is apparent that the accused might otherwise be prejudiced or disadvantaged." (*Id.,* at p. 358 [86 S.Ct. at p. 1520].)

[16]See American Bar Association, Standards Relating to Fair Trial and Free Press (Approved Draft 1968) section 3.5, subdivision (d). Two other notable reports from the same era did not recommend closed sessions of public trials as a solution to the problem of prejudicial publicity. (See Assn. of the Bar of the City of New York, Freedom of the Press and Fair Trial, Final Rep. with Recommendations (1967); Jud. Conf. of U. S., Rep. of Com. on Operation of Jury System on "Free Press-Fair Trial" Issue (Feb. 1968).)

challenges to a trial court order barring the public and the press from a pretrial suppression hearing in a criminal case.[17]

In its next term, however, in the case of *Richmond Newspapers, Inc.* v. *Virginia* (1980) 448 U.S. 555 [100 S.Ct. 2814, 65 L.Ed.2d 973] (*Richmond Newspapers*), the United States Supreme Court was faced for the first time with a trial court order that had directed the complete closure of a criminal trial. In that setting, the high court, relying exclusively upon the First Amendment, reversed the closure order. Because of its significance, we review the *Richmond Newspapers* decision in some detail.

a

The *Richmond Newspapers* case concerned the fourth murder trial of the defendant on the same charges. The first conviction had been reversed because of the improper admission of evidence; the second and third prosecutions ended in mistrial, the latter evidently based upon prejudicial pretrial information obtained by the jurors. (*Richmond Newspapers, supra,* 448 U.S. 555, 559 [100 S.Ct. 2814, 2818].) Upon commencement of the fourth trial, which was conducted before the same judge who had presided over two of the prior trials, the trial court granted the defendant's motion to close the courtroom for the entire trial. (*Id.,* at pp. 559-560 [100 S.Ct. at pp. 2818-2819].) Soon thereafter, reporters employed by Richmond Newspapers, Inc., moved to vacate the closure order. The court granted a hearing on the matter (from which the reporters were excluded, although they were represented by counsel), but thereafter denied the motion to vacate the closure order. (*Id.,* at p. 561 [100 S.Ct. at p. 2819].)

A closed trial resumed before the jury. After the presentation of evidence, the defendant moved for and the court granted yet another mistrial, and the jury was excused. Thereafter, the court summarily found the accused not

---

[17]The court in *Gannett* found that the Sixth Amendment guarantee of a "public trial" is "personal to the accused" (*Gannett, supra,* 443 U.S. at p. 380 [99 S.Ct. at p. 2905]), and that it provides no basis for a claim of public or press access to criminal trials (*id.,* at pp. 379-381 [99 S.Ct. at pp. 2905-2906]). Further, in discussing the assertion that the First Amendment provides a right of public or press access to criminal trials, the court in *Gannett* stated that assuming such a right exists, it was "given all appropriate deference" by the state trial court, for two reasons: First, the trial court "balanced the 'constitutional rights of the press and the public' against the 'defendants' right to a fair trial' " and reasonably concluded that the defendants' rights prevailed because an open hearing posed a " 'reasonable probability of prejudice to [the] defendants.' " (*Gannett, supra,* 443 U.S. at pp. 392-393 [99 S.Ct. at p. 2912].) Second, the court observed that "any denial of access in this case was not absolute but only temporary" (*id.,* at p. 393 [99 S.Ct. at p. 2912]) in view of the circumstance that the trial court released a transcript of the suppression hearing "[o]nce the danger of prejudice had dissipated." (*Ibid.*)

guilty of murder, and he was freed. (*Richmond Newspapers, supra,* 448 U.S. at pp. 561-562 [100 S.Ct. at pp. 2819-2820].) The state high court denied the reporters' requested writ relief challenging the closure order, and the United States Supreme Court granted Richmond Newspapers' petition for certiorari review. In separate opinions, the high court decided by a seven-to-one vote —albeit without a majority opinion—that the closure order violated the First Amendment.

Chief Justice Burger's lead opinion in *Richmond Newspapers,* speaking for three justices, reviewed the history of jury trials from 11th century England, when public attendance at "moots" was compulsory (*Richmond Newspapers, supra,* 448 U.S. at pp. 565-567 [100 S.Ct. at pp. 2821-2822]), through colonial America, when trials were regularly open (*id.,* at pp. 567-569 [100 S.Ct. at pp. 2822-2823]), and concluded "[f]rom this unbroken, uncontradicted history" that "a presumption of openness inheres in the very nature of a criminal trial under our system of justice." (*Id.,* at p. 573 [100 S.Ct. at p. 2825].) The lead opinion recognized, however, that this historical tradition did not by itself establish a *constitutional* right to attend criminal trials (*id.,* at p. 575 [100 S.Ct. at p. 2826]), although it did find that various utilitarian attributes of open trials helped explain why that practice is entitled to constitutional protection. Namely, the lead opinion observed, open trials enhance the performance and accuracy of trial proceedings, educate the public, and serve a "therapeutic" value to the community (*id.,* at pp. 569-573 [100 S.Ct. at pp. 2823-2825])—and this, considered together with historical tradition, leads to the conclusion that "the right to attend criminal trials is implicit in the guarantees of the First Amendment." (*Id.,* at p. 580 [100 S.Ct. at p. 2829], fn. omitted.) Significantly for our purposes, the lead opinion observed in a footnote that "[w]hether the public has a right to attend trials of civil cases is a question not raised by this case, but we note that historically both civil and criminal trials have been presumptively open." (*Id.,* at p. 580, fn. 17 [100 S.Ct. at p. 2829].) Finally, the lead opinion articulated its standard of review: it observed that the trial court made no findings supporting closure and did not consider alternatives to closure (*id.,* at pp. 580-581 [100 S.Ct. at pp. 2829-2830]), and that "[a]bsent an overriding interest articulated in findings, the trial of a criminal case must be open to the public." (*Id.,* at p. 581 [100 S.Ct. at pp. 2829-2830].)

Justice Brennan's concurring opinion in *Richmond Newspapers,* speaking for two justices, was, as shown below, "subsequently to become the actual touchstone for the new doctrine of access." (Cerruti, *"Dancing in the Courthouse": The First Amendment Right of Access Opens a New Round* (1995) 29 U. Rich. L.Rev. 237, 272 (Cerruti).) Justice Brennan began by asserting that "the First Amendment embodies more than a commitment to free expression

and communicative interchange for their own sakes; it has a *structural* role to play in securing and fostering our republican system of self-government. [Citations.] Implicit in this structural role is not only 'the principle that debate on public issues should be uninhibited, robust, and wide-open,' [citation], but also the antecedent assumption that valuable public debate— as well as other civic behavior—must be informed." (*Richmond Newspapers, supra,* 448 U.S. at p. 587 [100 S.Ct. at p. 2833], italics added.) But, Justice Brennan observed, "because 'the stretch of this protection [of a First Amendment "right of access"] is theoretically endless' " (*id.,* at p. 588 [100 S.Ct. at p. 2833])—there being " 'few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow' "—the theoretical right of access must be balanced "by considering the information sought and the opposing interests invaded." (*Ibid.* [100 S.Ct. at pp. 2833-2834].) In this regard, Justice Brennan elaborated on two principles, emphasized in the lead opinion, that may be used to confirm the existence and scope of a right of access: (i) historical tradition, and (ii) the specific structural value of access in the circumstances. "First, the case for a right of access has special force when drawn from an enduring and vital tradition of public entree to particular proceedings or information. [Citation.] Such a tradition commands respect in part because the Constitution carries the gloss of history. More importantly, a tradition of accessibility implies the favorable judgment of experience. Second, the value of access must be measured in specifics. Analysis is not advanced by rhetorical statements that all information bears upon public issues; what is crucial in individual cases is whether access to a particular government process is important in terms of that very process." (*Id.,* at p. 589 [100 S.Ct. at p. 2834].)

Regarding the first of the two factors—historical tradition—Justice Brennan noted, as did the Chief Justice, the rich history of "open" trials in England and colonial America (*Richmond Newspapers, supra,* 448 U.S. at pp. 589-591 [100 S.Ct. at pp. 2834-2835]), and concluded that "[a]s a matter of law and virtually immemorial custom, public trials have been the essentially unwavering rule in ancestral England and in our own Nation. [Citations.] Such abiding adherence to the principle of open trials 'reflect[s] a profound judgment about the way in which law should be enforced and justice administered.' " (*Id.,* at p. 593 [100 S.Ct. at p. 2836], fn. omitted.)

Regarding the second factor—the "specific structural value of public access in the circumstances" (*Richmond Newspapers, supra,* 448 U.S. at p. 598 [100 S.Ct. at p. 2839])—Justice Brennan identified, and amplified upon, interests similar to those noted by the lead opinion. Namely, open trials serve to demonstrate that justice is meted out fairly, thereby promoting public confidence in such governmental proceedings (*id.,* at pp. 594-596 [100 S.Ct.

at pp. 2836-2838]); "[m]ore importantly," open trials provide a means, "akin in purpose to the other checks and balances that infuse our system of government," by which citizens scrutinize and "check" the use and possible abuse of judicial power (*id.*, at p. 596 [100 S.Ct. at p. 2838]); and finally, "with some limitations" (*ibid.*), open trials serve to enhance the truth-finding function of the proceeding (*id.*, at pp. 596-597 [100 S.Ct. at p. 2838]). Justice Brennan concluded: "Popular attendance at trials, in sum, substantially furthers the particular public purposes of that critical judicial proceeding. In that sense, public access is an indispensable element of the trial process itself. Trial access, therefore, assumes structural importance in our 'government of laws.' " (*Richmond Newspapers, supra,* 448 U.S. at p. 597 [100 S.Ct. at pp. 2838-2839], fn. omitted.)

Applying these principles to the case at hand, Justice Brennan found that the "weight of historical practice" and "assessment of the specific structural value of public access in the circumstances . . . tip the balance strongly toward the rule that trials be open" (*Richmond Newspapers, supra,* 448 U.S. at p. 598 [100 S.Ct. at p. 2839]), and that the order purporting to close the proceeding at the unfettered discretion of the trial court and the parties was invalid. (*Ibid.*)[18]

b

Two years later, the high court reaffirmed and expanded upon *Richmond Newspapers* in *Globe Newspaper Co.* v. *Superior Court* (1982) 457 U.S. 596 [102 S.Ct. 2613, 73 L.Ed.2d 248] (*Globe*), finding unconstitutional a state statute that *mandated* closure of courtrooms during the testimony of minor victims in criminal trials. Justice Brennan's opinion for a majority of the court, granting relief to the newspaper that challenged the statute, reiterated that "to the extent that the First Amendment embraces a right of access to criminal trials, it is to ensure that [the] constitutionally protected 'discussion of governmental affairs' is an informed one." (*Globe, supra,* 457 U.S. at pp. 604-605 [102 S.Ct. at p. 2619].)

Turning to the two factors identified in his concurring opinion in *Richmond Newspapers, supra,* 448 U.S. at page 589 [100 S.Ct at page 2834]—(i)

---

[18]The difference in approach between the lead opinion and Justice Brennan's concurring opinion in *Richmond Newspapers, supra,* 448 U.S. 555, has been usefully described as follows: "The Chief Justice's theory, in a sentence, is that the first amendment carries with it those protections needed to make the amendment effective. Justice Brennan's theory, similarly reduced, is that the specific provisions of the first amendment and the constitutional structure of our government imply certain protections derived from the former and necessary to the preservation of the latter. In short, Chief Justice Burger's right of access preserves the first amendment; Justice Brennan's preserves our republican form of government." (Fenner & Koley, *Access to Judicial Proceedings: To Richmond Newspapers and Beyond* (1981) 16 Harv. C.R.-C.L. L.Rev. 415, 426-427, fn. omitted (Fenner & Koley).)

historical tradition and (ii) the specific structural value or utility of access in the circumstances—Justice Brennan's majority opinion in *Globe* concluded that as a general matter, criminal trials historically have been open, and that even if, as the state urged, historical tradition supported closure of some trials during the testimony of minor sex victims, that factor was not dispositive on the question of the propriety of *mandatory* closure during a minor victim's testimony. (*Globe, supra,* 457 U.S. at p. 605, fn. 13 [102 S.Ct. at p. 2619].) The court proceeded to address the specific structural value of access in the circumstances (*id.,* at p. 606 [102 S.Ct. at pp. 2619-2620]), found that the interests served by public access to criminal trials are "recognized in both logic and experience" (*ibid.*), and then strictly scrutinized the state's justification for the mandatory closure rule, in order to determine whether the mandatory rule was "necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." (*Id.,* at p. 607 [102 S.Ct. at p. 2620].) The court found that one asserted state interest—protection of minor victims of sex crimes from further trauma and embarrassment—was compelling, but also found the chosen means of effectuating that interest (*mandatory* closure during a child's testimony) to be overbroad and insufficiently tailored to the circumstances of each case, some of which might not warrant closure. (*Id.,* at pp. 607-609 [102 S.Ct. at pp. 2620-2622].) The court then addressed the other asserted state interest—the encouragement of minor victims of sex crimes to come forward and provide accurate testimony—and found "speculative" and "open to serious question as a matter of logic and common sense" the state's claim that its mandatory closure rule advanced that interest. (*Id.,* at pp. 609-610 [102 S.Ct. at p. 2622].)[19]

c

The high court next decided *Press-Enterprise Co. v. Superior Court of Cal.* (1984) 464 U.S. 501 [104 S.Ct. 819, 78 L.Ed.2d 629] (*Press-Enterprise I*), in which a California trial court had, at the request of the defendant, closed all but three days of a six-week voir dire of the prospective jurors in a capital case, and then denied the press's motion for release of the voir dire transcripts. (*Id.,* at pp. 503-504 [104 S.Ct. at pp. 820-821].) Press-Enterprise Co. unsuccessfully sought writ relief in our state courts, and upon review by grant of certiorari, the high court reversed. Chief Justice Burger's majority opinion, invalidating the trial court's order as violative of the First Amendment, emphasized both (i) the historic tradition of open jury selection in

---

[19]Concluding, the court in *Globe* emphasized the narrowness of its holding: "[A] rule of mandatory closure respecting the testimony of minor sex victims is constitutionally infirm. In individual cases, and under appropriate circumstances, the First Amendment does not necessarily stand as a bar to the exclusion from the courtroom of the press and general public during the testimony of minor sex-offense victims. But a mandatory rule, requiring no particularized determinations in individual cases, is unconstitutional." (*Globe, supra,* 457 U.S. at p. 611, fn. 27 [102 S.Ct. at p. 2622].)

England and colonial America (*id.*, at pp. 505-508 [104 S.Ct. at pp. 821-823]), and (ii) the various utilitarian policies advanced by open jury selection. (*Press-Enterprise I, supra,* 464 U.S. at pp. 508-509 [104 S.Ct. at pp. 823-824].)

After quoting the "compelling governmental interest" standard of review applied in *Globe, supra,* 457 U.S. at page 607 [102 S.Ct. at page 2620], the court in *Press-Enterprise I* paraphrased that standard as follows: "The presumption of openness may be overcome only by an *overriding interest* based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. *The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.*" (*Press-Enterprise I, supra,* 464 U.S. at p. 510 [104 S.Ct. at p. 824], italics added.)

The high court recognized that legitimate privacy concerns might call for closure or partial closure of the individual voir dire of some jurors (*Press-Enterprise I, supra,* 464 U.S. at pp. 511-512 [104 S.Ct. at pp. 824-825]),[20] and explained that under such circumstances a trial court properly could inform prospective jurors that they could request the opportunity to answer questions in camera, albeit with counsel present and on the record. The court concluded that limited closure might be appropriate in such circumstances. (*Id.,* at p. 512 [104 S.Ct. at p. 825].) Even then, the high court stated, a trial court should release the transcripts of the closed voir dire proceedings within a reasonable time if the judge determines that disclosure can be accomplished while safeguarding the juror's valid privacy interests. It observed that in the case at hand, the "parts of the transcript reasonably entitled to privacy could have been sealed without such a sweeping order; a trial judge should explain why the material is entitled to privacy." (*Id.,* at p. 513 [104 S.Ct. at p. 825].) The high court continued: "Assuming that some jurors had protectible privacy interests in some of their answers, the trial judge provided no explanation as to why his broad order denying access to information at the *voir dire* was not limited to information that was actually sensitive and deserving of privacy protection. Nor did he consider whether he could disclose the substance of the sensitive answers while preserving the anonymity of the jurors involved." (*Ibid.*) The court concluded that the blanket

---

[20]The court noted that the trial concerned allegations of rape, and that "[s]ome questions may have been appropriate to prospective jurors that would give rise to legitimate privacy interests of those persons. For example a prospective juror might privately inform the judge that she, or a member of her family, had been raped but had declined to seek prosecution because of the embarrassment and emotional trauma from the very disclosure of the episode. The privacy interests of such a prospective juror must be balanced against the historic values we have discussed and the need for openness of the process." (*Press-Enterprise I, supra,* 464 U.S. at p. 512 [104 S.Ct. at p. 825].)

closure order was invalid because the trial court made no findings, let alone specific ones, supporting the closure, and it improperly failed to consider alternatives to closure of the proceedings and sealing of the transcripts. (*Ibid.*)

d

The high court next addressed in *Waller* v. *Georgia* (1984) 467 U.S. 39 [104 S.Ct. 2210, 81 L.Ed.2d 31] (*Waller*) the general issue of closed courtrooms, this time in the context of a suppression hearing at which a criminal defendant invoked his Sixth Amendment right to a public trial. In that case the trial court, at the state's request and over the defendant's objection, closed a seven-day suppression hearing involving the admissibility of the state's wiretap evidence. Justice Powell's unanimous opinion for the court observed that "suppression hearings often are as important as the trial itself" and, indeed, frequently are the "the *only* trial" when, as commonly occurs, litigation ends in a negotiated disposition. (*Id.*, at pp. 46-47 [104 S.Ct. at pp. 2215-2216], italics in original.) The high court held that the blanket closure order was overbroad[21] and violated the defendant's right to a public trial (*id.*, at p. 47 [104 S.Ct. at pp. 2215-2216]), and it announced that the standard for reviewing closure under the Sixth Amendment was the same as the standard for reviewing closure under the First Amendment as "set out in *Press-Enterprise* [*I* ] and its predecessors." (*Ibid.*) The court observed in a footnote: "One of the reasons often advanced for closing a trial—avoiding tainting of the jury by pretrial publicity [citation]—is . . . attenuated where, as here, the jurors have been empaneled and instructed not to discuss the case or read or view press accounts of the matter." (*Id.*, at p. 47, fn. 6 [104 S.Ct. at p. 2216].)[22]

e

The high court returned to the issue of public access under the First Amendment in *Press-Enterprise Co.* v. *Superior Court, supra,* 478 U.S. 1

[21]The court observed that although "[u]nder certain circumstances" privacy interests "may well justify closing portions of a suppression hearing to the public," the state's "proffer was not specific as to whose privacy interests might be infringed, how they would be infringed, what portions of the tapes might infringe them, and what portion of the evidence consisted of the tapes. As a result, the trial court's findings were broad and general, and did not purport to justify closure of the entire hearing. . . . As it turned out, . . . the closure was far more extensive than necessary. The tapes lasted only 2½ hours of the 7-day hearing, and few of them mentioned or involved parties not then before the court." (*Waller, supra,* 467 U.S. at pp. 48-49 [104 S.Ct. at pp. 2216-2217], fn. omitted.)

[22]As observed in Cerruti, *supra,* 29 U. Rich. L.Rev. at page 265, "although no single case has expressly done so, the combination of *Richmond Newspapers* and *Waller* . . . effectively overruled *Gannett*."

(*Press-Enterprise II*), its most recent comprehensive treatment of the subject. Pursuant to Penal Code section 868 (permitting exclusion of the public from preliminary hearings when "necessary in order to protect the defendant's right to a fair and impartial trial"), the trial court had closed the 41-day preliminary hearing and thereafter refused to release the transcripts of that hearing. After the newspaper was denied writ relief by the Court of Appeal and this court,[23] the high court granted certiorari and reversed.

Chief Justice Burger's seven-to-two opinion for the court first addressed the "two complementary considerations" of (i) history—i.e., whether there is a "tradition of accessibility" concerning preliminary hearings, and (ii) utility—i.e., whether "public access plays a significant positive role in the functioning of [preliminary hearings]." (*Press-Enterprise II, supra,* 478 U.S. at p. 8 [106 S.Ct. at p. 2740].) Ignoring historical evidence of closed pretrial proceedings under English law and at the time of the adoption of the First Amendment (see *Gannett, supra,* 443 U.S. at pp. 387-389 [99 S.Ct. at pp. 2909-2910], and *id.,* at p. 396 [99 S.Ct. at pp. 2913-2914] (conc. opn. of Burger, C. J.)), the court found a "near uniform" practice of open preliminary hearings in this country from the 19th century to the present. (*Press-Enterprise II, supra,* 478 U.S. at pp. 10-11 [106 S.Ct. at pp. 2741-2742].) Turning to the utility question, the court found that access to preliminary hearings "plays a particularly significant positive role in the actual functioning of the process" (*id.,* at p. 11 [106 S.Ct. at p. 2742]), because the preliminary hearing is "often the final and most important step in the criminal proceeding" and in many cases provides " 'the sole occasion for public observation of the criminal justice system,' " and because closure frustrates the " 'community therapeutic value' of openness." (*Id.,* at pp. 12-13 [106 S.Ct. at p. 2742].)

The court concluded that preliminary hearings "are sufficiently like a trial" so as to justify the same treatment under the First Amendment. (*Press-Enterprise II, supra,* 478 U.S. at p. 12 [106 S.Ct. at p. 2742].) The court held that a qualified First Amendment right of access applied (*id.,* at p. 13 [106 S.Ct. at pp. 2742-2743]), and that the state statute permitting closure must be construed consistent with First Amendment requirements. (*Id.,* at pp. 13-14 [106 S.Ct. at pp. 2742-2743].) Stressing that the First Amendment right is not absolute, and can be overcome based upon "specific, on the record findings" (*id.,* at p. 13 [106 S.Ct. at p. 2743]) that closure is " 'essential to preserve higher values' " of " 'overriding interest' " (*id.,* at p. 9 [106 S.Ct. at p. 2741]), the court offered as possible examples the interest

---

[23]Our decision denying writ relief (*Press-Enterprise Co.* v. *Superior Court, supra,* 37 Cal.3d 772) reasoned that the right of access to criminal proceedings recognized in the high court cases extended only to actual criminal *trials.* (*Id.,* at p. 776.)

in protecting minor victims of sex crimes from the trauma and embarrassment of public scrutiny (*id.* at p. 9, fn. 2 [106 S.Ct. at p. 2741]) and the interest in providing a fair trial. (*Id.* at p. 14 [106 S.Ct. at p. 2743]; see also *post*, fn. 46 [concerning additional categories of possible "overriding interests"].) On the latter point, the court observed: "If the interest asserted is the right of the accused to a fair trial, the preliminary hearing shall be closed only if specific findings are made demonstrating that, first, there is a *substantial probability* that the defendant's right to a fair trial will be prejudiced by publicity *that closure would prevent* and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights." (478 U.S. at p. 14 [106 S.Ct. at p. 2743], italics added.)

f

Thereafter, the high court strongly reaffirmed the First Amendment holdings and analysis of *Press-Enterprise II, supra,* 478 U.S. 1, and *Globe, supra,* 457 U.S. 596, in a unanimous opinion, issued without oral argument, invalidating closure of a preliminary hearing under a Puerto Rico law similar to the California statute at issue in *Press-Enterprise II.* (*El Vocero de Puerto Rico* v. *Puerto Rico* (1993) 508 U.S. 147, 149-151 [113 S.Ct. 2004, 2005-2006, 124 L.Ed.2d 60].)

Lower court opinions concerning access in criminal cases have uniformly followed and substantially expanded upon the high court's access decisions. (See, e.g., *United States* v. *Chagra* (5th Cir. 1983) 701 F.2d 354 (*Chagra*) [bail hearing]; *In re Charlotte Observer (Div. of Knight Pub. Co.)* (4th Cir. 1989) 882 F.2d 850 (*Charlotte Observer*) [change of venue hearing]; *In re Washington Post Co.* (4th Cir. 1986) 807 F.2d 383 [plea hearing]; *Application of Storer Communications, Inc.* (6th Cir. 1987) 828 F.2d 330 [pretrial ex parte recusal hearing]; *U.S.* v. *Edwards* (5th Cir. 1987) 823 F.2d 111 [midtrial chambers hearing concerning juror misconduct]; and cases cited in Cerruti, *supra,* 29 U. Rich. L.Rev. at pp. 266-267.)

2

Although the high court's opinions in *Richmond Newspapers, Globe, Press-Enterprise I,* and *Press-Enterprise II* all arose in the criminal context, the reasoning of these decisions suggests that the First Amendment right of access extends beyond the context of criminal proceedings and encompasses civil proceedings as well. (See, e.g., *Richmond Newspapers, supra,* 448 U.S. 555, 580, fn. 17 [100 S.Ct. 2814, 2829] (lead opn. of Burger, C. J.) ["historically both civil and criminal trials have been presumptively open"]; cf. *Gannett, supra,* 443 U.S. at pp. 386-387, fn. 15 [99 S.Ct. at p. 2908]

["[T]here is no principled basis upon which a public right of access to judicial proceedings can be limited to criminal cases . . . . [¶] Indeed, many of the advantages of public criminal trials are equally applicable in the civil trial context. . . . Thus, in some civil cases the public interest in access, and the salutary effect of publicity, may be as strong as, or stronger than, in most criminal cases."].)[24]

Indeed, every lower court opinion of which we are aware that has addressed the issue of First Amendment access to *civil* trials and proceedings has reached the conclusion that the constitutional right of access applies to civil as well as to criminal trials. (*Publicker Industries, Inc.* v. *Cohen* (3d Cir. 1984) 733 F.2d 1059 (*Publicker*) [public has First Amendment right of access to civil proceedings concerning motion for preliminary injunction in securities litigation; closure is not warranted merely to protect disclosure of poor corporate management]; see also *Westmoreland* v. *Columbia Broadcasting System, Inc.* (2d Cir. 1984) 752 F.2d 16 [public and press have First Amendment right to attend, but not to televise, civil trial]; *In re Iowa Freedom of Information Council* (8th Cir. 1984) 724 F.2d 658 [First Amendment right of access applies to civil proceedings for contempt, but portions of proceeding involving trade secrets properly were closed]; *Newman* v. *Graddick* (11th Cir. 1983) 696 F.2d 796 [First Amendment right of access applies to hearings in class actions concerning prison overcrowding]; *Del Papa* v. *Steffen* (1996) 112 Nev. 369 [915 P.2d 245] [First Amendment right of access applies to state high court's review of judicial disciplinary proceedings]; *State* v. *Cottman Transmission* (1988) 75 Md.App. 647 [542 A.2d 859] [First Amendment and state constitutional right of access apply to proceedings and documents in unfair trade practices lawsuit; closure not justified merely in order to minimize damage to corporate reputation].)[25] No case to which we have been cited or of which we are aware suggests, much

---

[24]In *Gannett, supra,* 443 U.S. at pages 386-387, footnote 15 [99 S.Ct. at page 2908], the court observed, in addition to the passages quoted directly above, that "[w]hile the operation of the judicial process in civil cases is often of interest only to the parties in the litigation, this is not always the case. *E.g., Dred Scott* v. *Sanford* [(1856)] 19 How. 393 [60 U.S. 393, 15 L.Ed. 691]; *Plessy* v. *Ferguson* [(1896)] 163 U.S. 537 [16 S.Ct. 1138, 41 L.Ed. 256]; *Brown* v. *Board of Education* [(1954)] 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873]; *University of California Regents* v. *Bakke* [(1978)] 438 U.S. 265 [98 S.Ct. 2733, 57 L.Ed.2d 750]."

[25]Numerous reviewing courts likewise have found a First Amendment right of access to civil litigation documents filed in court as a basis for adjudication. (See *Brown & Williamson Tobacco Corp.* v. *F.T.C.* (6th Cir. 1983) 710 F.2d 1165, 1179 (*Brown & Williamson*) [documents filed in civil litigation; "[i]n either the civil or criminal courtroom, secrecy insulates the participants, masking impropriety, obscuring incompetence, and concealing corruption"]; *Rushford* v. *New Yorker Magazine, Inc.* (4th Cir. 1988) 846 F.2d 249 (*Rushford*) [summary judgment pleadings]; *Matter of Continental Illinois Securities Litigation* (7th Cir. 1984) 732 F.2d 1302 (*Continental Illinois Securities*) [records related to "hybrid summary judgment motion"]; cf. *Grove Fresh Distributors, Inc.* v. *Everfresh Juice Co.* (7th Cir. 1994) 24 F.3d 893 [assuming both a First Amendment and a common law right of access to civil

less holds, that the First Amendment right of access as articulated by the high court does not apply, as a general matter, to ordinary civil proceedings.

a

Respondent observes that the high court has not explicitly extended its First Amendment access holdings to civil cases, and asserts that in view of the court's prior failure, almost two decades ago, to recognize such a right even in criminal cases, we should not assume that the high court would find a First Amendment right of access in civil cases such as the one now before us. We find this speculation unpersuasive. As noted above, in 1980 the high court dramatically reversed its earlier course, since then repeatedly has recognized a First Amendment right of access in criminal cases, and has suggested in dicta that a corresponding right of access exists in civil cases as well. (*Richmond Newspapers, supra,* 448 U.S. 555, 580, fn. 17 [100 S.Ct. 2814, 2829] (lead opn. of Burger, C. J.); cf. *Press-Enterprise II, supra,* 478 U.S. 1, 27-28 [106 S.Ct. 2735, 2750-2751] (dis. opn. of Stevens, J.).) As recently as 1993, the high court unanimously reaffirmed its First Amendment access cases in the criminal law context. Moreover, the high court has not accepted review of any of the numerous lower court cases that have found a general First Amendment right of access to civil proceedings, and we have not found a single lower court case holding that generally there is no First Amendment right of access to civil proceedings. Under these circumstances, we believe there is no reason to doubt that, in general, the First Amendment right of access applies to civil proceedings as well as to criminal proceedings.

In a related contention, respondent observes that there is "no specific constitutional language providing either the public or the press with constitutional access to civil trials" and asserts that such a right should not be "read into the Constitution." The same argument has been rejected explicitly in the high court's criminal access cases. As explained in Chief Justice

litigation documents].) Similarly, in *Copley Press, Inc.* v. *Superior Court* (1992) 6 Cal.App.4th 106 [7 Cal.Rptr.2d 841] (*Copley Press*), the Court of Appeal ruled that the press had a right to inspect the clerk's "rough minute" books of a California trial court. The reviewing court observed that "in general" the First Amendment provides "broad access rights to judicial hearings and records . . . both in criminal and civil cases." (*Id.,* at p. 111.)

By contrast, decisions have held that the First Amendment does not compel public access to discovery materials that are neither used at trial nor submitted as a basis for adjudication. (See, e.g., *Seattle Times Co.* v. *Rhinehart* (1984) 467 U.S. 20 [104 S.Ct. 2199, 81 L.Ed.2d 17]; *Continental Illinois Securities, supra,* 732 F.2d at p. 1309, fn. 11; *Matter of Krynicki* (7th Cir. 1992) 983 F.2d 74, 75-76 (order by Easterbrook, J.) (*Krynicki*)); Fenner & Koley, *supra,* 16 Harv. C.R.-C.L. L.Rev. at p. 434 ["The presumption of access does not apply until the documents or records of such proceedings are filed with the court or are used at a judicial proceeding."].)

Burger's lead opinion in *Richmond Newspapers, supra*, 448 U.S. 555, arguments such as those made by respondent "have not precluded recognition of important rights not enumerated. Notwithstanding the appropriate caution against reading into the Constitution rights not explicitly defined, the Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees. For example, the rights of association and of privacy, the right to be presumed innocent, and the right to be judged by a standard of proof beyond a reasonable doubt in a criminal trial, as well as the right to travel, appear nowhere in the Constitution or Bill of Rights. Yet these important but unarticulated rights have nonetheless been found to share constitutional protection in common with explicit guarantees. . . . [F]undamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." (*Id.*, at pp. 579-580 [100 S.Ct. at p. 2829], fn. omitted; accord, *id.*, at p. 588, fn. 4 [100 S.Ct. at p. 2833] (conc. opn. of Brennan, J.); *Globe, supra*, 457 U.S. 596, 604 [102 S.Ct. 2613, 2618] [the high court has "long eschewed any 'narrow, literal conception' of the Amendment's terms"].) No reason appears for us to conclude otherwise.[26]

b

It is true, as respondent observes, that in *every* criminal case—and in only *some* civil cases—the public is a party. Respondent is led by this circumstance to suggest that any right of access in the civil context should be limited to cases in which "the public is a party, or in which the public or a significant portion of the public has a direct and important interest," and that there is nothing of concern to the public in the present case "beyond the fact that two famous people are involved in a private dispute." No decision of which we are aware has limited the First Amendment right of access to those civil trials or proceedings that directly involve the public or are deemed newsworthy to a "significant portion" of the public. In any event, we disagree with respondent's premise: We believe that the public has an interest, in *all* civil cases, in observing and assessing the performance of its public judicial system, and that interest strongly supports a general right of access in ordinary civil cases.

In a similar vein, respondent asserts that "most civil cases, including the civil case here involved, are purely private disputes litigated by private

---

[26]We also reject respondent's related argument that "[i]f the Constitution silently included an unwritten First Amendment right of access in the press and the public to attend all trials, civil and criminal," the Sixth Amendment's guarantee of a public criminal trial would be "surplusage and unnecessary." Because the Sixth Amendment guarantee applies to a *defendant*, and not the *public* or the press (see *Gannett, supra*, 443 U.S. 368, 379-381 [99 S.Ct. 2898, 2905-2906]), a First Amendment right of access may not legitimately be viewed as surplusage.

persons, which become public only because the parties are unable to resolve them privately." Assuming this is generally true, it does not assist respondent. As noted above, a trial court is a public governmental institution. Litigants certainly anticipate, upon submitting their disputes for resolution in a public court, before a state-appointed or publicly elected judge, that the proceedings in their case will be adjudicated in public. As observed in *State v. Cottman Transmission, Inc., supra,* 542 A.2d 859, 864, "[a]n individual or corporate entity involved as a party to a civil case is entitled to a fair trial, not a private one."[27] Indeed, the underlying litigants in this case fully expected a public trial, and apparently were surprised when the trial court, on its own motion, announced closure and temporary sealing of the transcripts of the proceedings conducted outside the presence of the jury.

Respondent next asserts that "[t]he policy reasons advocated in support of public trials do not support an unrestricted right of access to civil trials; delaying until the conclusion of the trial public access to matters heard outside the presence of the jury is not inconsistent with these policy reasons." First, in neither the criminal nor the civil context do the high court cases or their progeny described above grant an "unrestricted" right of access; each decision has been careful to explain that, under certain circumstances, the presumption of openness can be overcome upon a proper showing. Second, the dicta in the high court criminal cases, and the clear holdings of numerous civil progeny of those cases, convincingly conclude that the utilitarian values supporting public criminal trials and proceedings apply with at least equal force in the context of ordinary civil trials and proceedings.[28] Finally, the same reasons that have led the courts to conclude that delaying public access until the conclusion of a criminal trial is inconsistent with these utilitarian values, compel us not to countenance delaying public access until the conclusion of a civil trial.

---

[27] In *Estate of Hearst* (1977) 67 Cal.App.3d 777 [136 Cal.Rptr. 821] (*Hearst*), the court explained with regard to the related issue of access to filed litigation documents: "[W]hen individuals employ the public powers of state courts to accomplish private ends, . . . they do so in full knowledge of the possibly disadvantageous circumstance that the documents and records filed . . . will be open to public inspection." (*Id.,* at p. 783.) "[I]n a sense [such civil litigants] take the good with the bad, knowing that with public protection comes public knowledge" of otherwise private facts. (*Id.,* at p. 784.)

[28] The Court of Appeal also has noted the utility of open access in civil cases. As observed in *Hearst, supra,* 67 Cal.App.3d 777: "[T]he public has a legitimate interest in access to . . . court documents . . . . If public court business is conducted in private, it becomes impossible to expose corruption, incompetence, inefficiency, prejudice, and favoritism. For this reason traditional Anglo-American jurisprudence distrusts secrecy in judicial proceedings and favors a policy of maximum public access to proceedings and records of judicial tribunals." (*Id.,* at p. 784.) *Brian W.* v. *Superior Court* (1978) 20 Cal.3d 618 [143 Cal.Rptr. 717, 574 P.2d 788], which upheld a juvenile court's discretion to permit the press to attend a "fitness hearing," observed that the high court has "repeatedly recognized the salutary function served by the press in encouraging the fairness of trials and subjecting the administration of justice to the

c

Respondent contends that "the laudable goal of permitting the public to learn how their government works, if not subjected to practical limitations, would theoretically warrant permitting the public to sit and contemporaneously eavesdrop upon everything their government does." Although the point is well taken (see *Richmond Newspapers, supra,* 448 U.S. at p. 588 [100 S.Ct. at pp. 2833-2834] (conc. opn. of Brennan, J.)), it has been accounted for in decisions that have been careful not to extend the public's right of access beyond the adjudicative proceedings and filed documents of trial and appellate courts.[29]

3

We conclude, in light of the high court case law and its progeny, that, in general, the First Amendment provides a right of access to ordinary civil trials and proceedings, that constitutional standards governing closure of trial proceedings apply in the civil setting, and that section 124 must, accordingly, be interpreted in a manner compatible with those standards.[30]

beneficial effects of public scrutiny." (*Id.,* at p. 625.) We acknowledged in that case "the important role of the press in monitoring the administration of justice on behalf of the public." (*Id.,* at p. 626; see also *id.,* at pp. 622-623 [describing a commission report concerning the benefit of "greater participation by the press" in juvenile court proceedings].)

[29]In *Press-Enterprise II,* the high court distinguished "presumptively open" preliminary hearings from other proceedings as to which there is no First Amendment right of access. It observed: "Although many governmental processes operate best under public scrutiny, it takes little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly. A classic example is that 'the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings.' [Citation.] Other proceedings plainly require public access." (*Press-Enterprise II, supra,* 478 U.S. at pp. 8-9 [106 S.Ct. at p. 2740].)

Decisions have declined to extend a right of access to executive branch or congressional meetings (*Soc. of Professional Journalists* v. *Sec. of Labor* (D. Utah 1985) 616 F.Supp. 569, 572, app. dism. as moot (10th Cir. 1987) 832 F.2d 1180), the deliberations and conferences of an appellate court (Cerruti, *supra,* 29 U. Rich. L.Rev. at p. 307; Fenner & Koley, *supra,* 16 Harv. C.R.-C.L. L.Rev. at p. 439; *Krynicki, supra,* 983 F.2d 74, 75), and the trial notes of a trial court judge (*State* ex rel. *Steffen* v. *Kraft* (1993) 67 Ohio St.3d 439 [619 N.E.2d 688]). As observed in *Copley Press, supra,* 6 Cal.App.4th 106, 113-115, preliminary drafts of orders or opinions, notes, and internal memoranda do not constitute "court records" that are open to the public for inspection.

[30]We observe that various statutes set out, for example, in the Code of Civil Procedure, Family Code, and Welfare and Institutions Code provide for closure of certain civil proceedings. We address herein the right of access to ordinary civil proceedings in general, and not any right of access to particular proceedings governed by specific statutes. In this regard, compare generally *Div. of Youth & Fam. Serv.* v. *J.B.* (1990) 120 N.J. 112 [576 A.2d 261] (the First Amendment right of access applies to parental termination proceedings; per se rules of closure are inappropriate) with *San Bernardino County Dept. of Public Social Services* v.

Respondent raises a number of arguments in an attempt to demonstrate that, even if there is a general First Amendment right of access to ordinary civil trials and proceedings, the First Amendment is not implicated on the facts of this case, and hence that we need not interpret section 124 in the context of First Amendment requirements. As explained below, we disagree.

a

Respondent asserts that closure is constitutionally permissible when the only portions of the trial that are closed are those that properly are held outside the presence of the sworn jury. The same argument might have been made regarding the closed voir dire proceedings in *Press-Enterprise I, supra,* 464 U.S. 501, and the closed preliminary hearing in *Press-Enterprise II, supra,* 478 U.S. 1, and yet the United States Supreme Court held that a First Amendment right of public access to the proceedings exists in those cases, even though such proceedings were not held in the presence of a sworn jury. Lower court decisions confirm this point. For example, in *Rovinsky* v. *McKaskle* (5th Cir. 1984) 722 F.2d 197, 201 (*Rovinsky*), the court found unconstitutional the holding of the substantive closed-chambers hearings involved in that case, observed that "[t]he right to a public trial is not limited to . . . times when the jury is present," and commented that "[a]ny necessity that the motions be heard outside the jury's presence did not require that they be heard behind closed doors." (*Ibid.*)[31] The circumstance that the closure orders here barred the public and the press only from those proceedings that were held outside the presence of the jury does not obviate the necessity to comply with the First Amendment right of access.

b

In a related argument, respondent contends "[t]here was no English common law right to attend . . . civil [proceedings] or discussions outside the presence of the jury that can reasonably be found to have been engrafted into the First Amendment; and at English common law there was no right of the press to publish such proceedings." As to the first proposition, we agree with numerous other courts (e.g., *Publicker, supra,* 733 F.2d 1059) that history does suggest such a general right of access to civil trials and related

---

*Superior Court* (1991) 232 Cal.App.3d 188 [283 Cal.Rptr. 332] (acknowledging a First Amendment right of access to civil proceedings generally, but noting that most states have concluded that no such constitutional right extends to juvenile proceedings, and declining to recognize such a right, absent compulsion by the United States Supreme Court); and see *In re Keisha T.* (1995) 38 Cal.App.4th 220, 230 [44 Cal.Rptr.2d 822] (noting, but not deciding, First Amendment access issue in context of juvenile court records).

[31]*Rovinsky* was decided under Sixth Amendment principles, but as the court observed (722 F.2d at p. 199 & fn. 4), and as the high court soon thereafter affirmed (*Waller, supra,* 467 U.S. 39), the governing principles under that amendment are the same as those pertaining to the right of access under the First Amendment.

proceedings. In any event, although evidence of such a historical tradition is a factor that strengthens the finding of a First Amendment right of access (*In re Times-World Corp.* (1988) 7 Va.App. 317 [373 S.E.2d 474, 478] (*Times-World*), the absence of explicit historical support would not, contrary to respondent's implicit premise, negate such a right of access.[32] Respondent's second proposition is correct—at English common law there was (and is) no right of the press to publish even accurate reports of trial proceedings held outside the presence of the jury—but *that* aspect of English law long has been rejected in this country, and clearly was *not* "engrafted into the First Amendment."[33]

c

Respondent asserts that chambers "[c]onferences between the court and counsel . . . are not part of the trial process." Despite respondent's repeated assertion that the closed sessions in the underlying trial were chambers conferences, the closed proceedings here at issue were not in fact held in chambers: as noted, *ante,* at page 1182 et seq., the closed proceedings in

---

[32]See *Press-Enterprise II, supra,* 478 U.S. 1 (post-First Amendment history that supports public access may, when combined with utilitarian interests supporting access, trump earlier history that supports a tradition of closure); *Chagra, supra,* 701 F.2d 354, 363 ("[T]he lack of an historic tradition of open bail reduction hearings does not bar our recognizing a right of access to such hearings."); Comment, *The First Amendment Right of Access to Civil Trials After Globe Newspaper Co. v. Superior Court* (1984) 51 U. Chi. L.Rev. 286, 294 ("Although history may be used to assess the existence of a public right of access, . . . any restrictions on that right cannot be justified solely by a tradition of closure."); see also Cerruti, *supra,* 29 U. Rich. L.Rev. at pages 280, 308; Dyk, *Newsgathering, Press Access, and the First Amendment* (1992) 44 Stan.L.Rev. 927, 947, footnote 126; Liotti, *Closing the Courtroom to the Public: Whose Rights Are Violated?* (1997) 63 Brook. L.Rev. 501, 525-526, 535 and footnote 239.

[33]Under long-established English law, the public and the press in England generally have had no right akin to the right of the public and the press in this country to publish *before or during trial* accounts of trial proceedings, even accurate and truthful ones. Instead, pursuant to established English law, anyone who publishes such an account at such a time may be held in contempt of court for doing so. (E.g., *Roach* v. *Garvan* [*The St. James's Evening Post Case*] (1742) 26 Eng.Rep. 683, 685 [newspaper publishers committed to prison for publishing material "prejudicing mankind against persons before the cause is heard"]; *Rex* v. *Fisher* (1811) 170 Eng.Rep. 1253; *The King* v. *Clement* (1821) 106 Eng.Rep. 918 [newspaper publisher held in contempt for publishing true and accurate account of proceedings in a trial when separate trials of codefendants were pending]; Case and Comment, *Contempt of Court* (1978) Crim. L.Rev. 221, 222 [publishers may be held in contempt of court for publishing and televising, during trial, "material which had been deliberately kept from the jury's ears," it being well known and established that "newspapers should not report what went on in the jury's absence"].) Decisions make clear that *that* historical tradition, which existed at the time of the drafting and adoption of the First Amendment, was not engrafted into the First Amendment. (*Bridges* v. *California* (1941) 314 U.S. 252, 263-264 [62 S.Ct. 190, 194, 86 L.Ed. 192, 159 A.L.R. 1346] [American, unlike English courts, cannot hold press in contempt for publishing critical views concerning pending cases]; *Shortridge, supra,* 99 Cal. 526, 534-535 [distinguishing American and English law on this point].)

question were held outside the jury's presence *in the courtroom*, and the trial judge only belatedly deemed the courtroom an "extension of chambers" on the same day that petitioner KNBC filed its formal challenge to the closure order. In any event, respondent's assertion that chambers proceedings are categorically "not part of the trial process"—and hence are not subject to the First Amendment right of access—is erroneous.

The cases explicitly recognize that although in some situations it may be appropriate to exclude the public and the press from chambers proceedings,[34] a proceeding that would be subject to a right of access if held in open court does not lose that character simply because the trial court chooses to hold the proceeding in chambers.[35] As explained below, case law supports the observation that "shifting portions of the proceedings to a bench conference or an in camera proceeding to escape the open-trial right goes beyond the historically accepted uses of these proceedings and is unconstitutional." (Fenner & Koley, *supra,* 16 Harv. C.R.-C.L. L.Rev. 415, 440, fn. 124, italics omitted.)

For example, in *Cable News Network, Inc.* v. *U.S.* (D.C. Cir. 1987) 824 F.2d 1046 [263 App.D.C. 66], the trial court permitted the potential jurors to elect, at their unfettered discretion, whether to submit to voir dire in open court or in closed chambers. Because, among other things, the trial court gave no reason for this practice, and made no record supporting the resulting closed chambers voir dire, the reviewing court found the use of closed

---

[34]Some of these cases contain broad dicta suggesting that chambers proceedings generally may be closed, but in each decision the court's actual holding is narrow and fact-specific. For example, courts have concluded that the subject matter of the particular proceeding historically has not been open and that access would impede rather than assist such proceedings. (*B.H.* v. *McDonald* (7th Cir. 1995) 49 F.3d 294, 299-301 (*McDonald*) [posttrial proceedings to implement a consent decree]; *U.S.* v. *Edwards, supra,* 823 F.2d 111, 116-117 [midtrial questioning of jurors to investigate potential juror misconduct].) Other courts have approved the use of closed chambers sessions on the ground that the particular proceeding concerned "perfunctory . . . technical matters" as to which there is no right of access (*U.S.* v. *Miranda* (S.D.Fla. 1990) 746 F.Supp. 1546, 1547), and some courts have asserted that "[n]on-public exchanges between counsel and the court on . . . technical legal issues and routine administrative problems" during which "no fact finding" occurs "ordinarily" do not violate any right of public trial or access to trial. (*United States* v. *Norris* (5th Cir. 1986) 780 F.2d 1207, 1210.) Finally, courts also have approved the holding of closed chambers hearings, or closed courtroom hearings, when trial court findings establish that there is no less restrictive means of accomplishing an overriding interest, such as protection of a continuing law enforcement investigation. (*U.S.* v. *Valenti* (11th Cir. 1993) 987 F.2d 708, 714-715 (*Valenti*) ["in camera" motions and proceedings]; *People* v. *Ramos* (1997) 90 N.Y.2d 490 [662 N.Y.S.2d 739, 685 N.E.2d 492, 496-501] (*Ramos*) [closed courtroom].)

[35]Consistent with this observation, the court in *U.S.* v. *Edwards, supra,* 823 F.2d 111, which ultimately found no right of access, accepted the proposition that a reviewing court should "look through the [trial] court's labeling of the procedures as 'in chambers' conferences, as opposed to 'trial proceedings,' and perform a functional analysis." (*Id.,* at p. 115.)

chambers sessions invalid under the First Amendment. (*Id.*, at pp. 1048-1049.) Similarly, in *Rovinsky, supra,* 722 F.2d 197, over objection, the trial court heard in chambers various motions *in limine* to limit the defendant's cross-examination of prosecution witnesses. Because the trial court gave no reason for holding the proceedings in closed chambers and made no record providing a basis for the practice, the reviewing court found the use of closed chambers sessions invalid under the First Amendment. (*Id.*, at p. 201.)

*Times-World, supra,* 373 S.E.2d 474, addressed in a criminal trial a situation similar to that in the present case. The trial court, on its own motion, held all jury voir dire, as well as numerous midtrial substantive hearings and proceedings, in closed chambers. (*Id.*, at p. 476.) On the last day of the three-day trial, and after most of the evidence had been presented, the court finally held a hearing on the closing of portions of the trial. At that point the trial court rejected the press's renewed request for access and explained that closure was based upon its views that there was "insufficient room in chambers to accommodate members of the press," that the media's presence "would have precluded an informal style for the hearings," and that the court "did not 'see anything so pressing about this case that it [could not] be printed after the case [was] decided.' " (*Id.*, at p. 476.)

In holding the trial court's findings inadequate, the reviewing court commented: "The hearings conducted in chambers during the trial consisted of more than mere bench conferences; they included the hearing of disputed testimony, a motion to strike the testimony of a witness, a motion to strike the Commonwealth's case-in-chief, a motion to strike all of the evidence at the end of trial, two motions for a mistrial, and the selection of jury instructions. We, therefore, reject the Commonwealth's argument that the hearings held in chambers were mere side-bar conferences not subject to the first amendment rights of the public and press." (*Times-World, supra,* 373 S.E.2d at p. 479.)

In light of these authorities, we reject respondent's assertion that substantive chambers proceedings are categorically not part of the trial process, and are not subject to the First Amendment right of access.

## III

The First Amendment cases discussed above inform our interpretation of Code of Civil Procedure section 124, which, of course, we must construe in a fashion that avoids rendering its application unconstitutional. (*Romero, supra,* 13 Cal.4th 497, 509; *Press-Enterprise II, supra,* 478 U.S. 1, 13-14 [106 S.Ct. 2735, 2742-2743].) ■ Although, prior to the 1980's, closure and/or sealing under the common law and pursuant to the statute may have been permissible under circumstances that would fail to meet the minimum

constitutional standards set out in more recent United States Supreme Court decisions, it is clear today that substantive courtroom proceedings in ordinary civil cases are "presumptively open" and that section 124 must be interpreted to preclude closure of proceedings that satisfy the high court's historical tradition/utility considerations—unless two things occur.

First, a trial court must provide notice to the public of the contemplated closure. Based upon authorities from other jurisdictions that have considered the question,[36] we conclude that when a motion to close a proceeding is made in open court (or, for example, at a closed bench conference held during open court proceedings), adequate notice of the contemplated closure is provided if the trial judge thereafter announces in open court that he or she plans to hold (or to consider holding) that proceeding in closed session. When a motion seeking closure is made in a written filing, adequate notice is provided by publicly docketing the motion reasonably in advance of a determination thereon. In either circumstance, the notice requirement should not impose an onerous or undue burden on trial courts.

Second, *before* substantive courtroom proceedings are closed or transcripts are ordered sealed, a trial court must hold a hearing[37] and expressly

[36]The court in *Globe, supra,* 457 U.S. at page 609, footnote 25 [102 S.Ct. at page 2621], observed that, in order to facilitate a trial court's case-by-case determination of closure, "representatives of the press and general public 'must be given an opportunity to be heard on the question of their exclusion.' " The lower courts have in turn attempted to clarify the kind of notice that is required prior to the hearing contemplated by *Globe.* (See *In re Knight Pub. Co.* (4th Cir. 1984) 743 F.2d 231, 234 ["When a closure motion is made in open court, persons present must be given notice and an opportunity to object before the public can be excluded. . . . [¶] . . . [W]hen the request for closure is not made in open court . . . due process requires that the public be given some notice that closure may be ordered"]; *United States* v. *Criden* (3d Cir. 1982) 675 F.2d 550, 559 (*Criden*) [the Constitution does not require "individual notice to the press or to the public"; a motion for closure must be posted on the docket reasonably in advance of a hearing on or disposition of a closure motion, in order to give notice to the public of the closure request]; *United States* v. *Brooklier* (9th Cir. 1982) 685 F.2d 1162, 1168 [adopting generally the *Criden* approach, but also requiring individual notice to those "specific members of the public" who, the court is aware, wish to be present]; but see *Valenti, supra,* 987 F.2d 708, 713 [relying upon *Gannett, supra,* 443 U.S. 368, 401 [99 S.Ct. 2898, 2916] (conc. opn. of Powell, J.), as establishing that the required notice and opportunity to be heard " 'extends no farther than the persons actually present at the time the motion for closure is made, for the alternative would require substantial delays in trial and pretrial proceedings while notice was given to the public' "].)

[37]The high court cases, and their lower court progeny, suggest a flexible and context-specific approach to the timing of the closure hearing and requisite trial court findings. At one end of the spectrum, a *preclosure hearing* with requisite findings is required before closure may occur. For example, in *Press-Enterprise II, supra,* 478 U.S. 1, the high court held that a preliminary hearing "shall be closed only if specific findings are made demonstrating that, first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent . . . ." (*Id.,* at p. 14. [106 S.Ct. at p.

find that (i) there exists an overriding[38] interest supporting closure and/or sealing; (ii) there is a substantial probability[39] that the interest will be prejudiced absent closure and/or sealing; (iii) the proposed closure and/or sealing is narrowly tailored to serve the overriding interest; and (iv) there is no less restrictive means of achieving the overriding interest.[40]

## A

## 1

We address the two principles—(i) historical tradition, and (ii) the specific structural utility of access in the circumstances—employed by the

2743].) The high court apparently contemplates a preclosure hearing in these circumstances and would, we assume, require a preclosure hearing and findings in a situation such as that presented in *Times-World, supra,* 373 S.E.2d 474, in which the trial court apparently planned, well in advance, to conduct in closed session essentially all substantive proceedings held outside the jury's presence.

At the other end of the spectrum, as a general matter a closure hearing of course is not required prior to or even after the holding of most bench conferences. (See *Valenti, supra,* 987 F.2d 708, 713; cf. *United States* v. *Smith* (3d Cir. 1986) 787 F.2d 111, 114-115.) Even with regard to bench or chambers proceedings at which substantive rulings are made, courts have approved after-the-fact closure hearings and findings. For example, the high court in *Press-Enterprise I, supra,* 464 U.S. 501, did not suggest that a trial court must articulate findings that a closed chambers voir dire hearing is necessary *before* such a hearing takes place, but instead contemplated that a trial court should make after-the-fact findings concerning whether the transcripts of such a closed hearing should remain sealed or should be disclosed in full or in part. (*Id.,* at p. 512 [104 S.Ct. at p. 825].) Consistently, *Valenti, supra,* 987 F.2d 708, contains broad language suggesting that the trial court did not err in closing pretrial bench and chambers proceedings without first conducting a closure hearing, and that an after-the-fact hearing with appropriate findings was sufficient. (*Id.,* at pp. 713-714.)

[38]As shown in part II C 1, although the high court has employed various formulations to describe the gravity of the interest that will justify courtroom closure, the court most often, and most recently, has used the "overriding interest" terminology. Most lower court decisions, including the courts in *Times-World, supra,* 373 S.E.2d 474, and *Publicker, supra,* 733 F.2d 1059, have adopted that test. We thus shall employ that test.

[39]The high court stated in *Waller, supra,* 467 U.S. 39, 48 [104 S.Ct. 2210, 2216], that the asserted interest must be shown to be "likely to be prejudiced," and in *Press-Enterprise II, supra,* 478 U.S. 1, 14 [106 S.Ct. 2735, 2743], it more recently required a showing of "substantial probability" that the interest will be "prejudiced by publicity that closure would prevent." We thus shall employ the latter formulation.

[40]Most courts have stressed that the press bears "the burden of showing that reasonable alternatives to closure are available." (*Times-World, supra,* 373 S.E.2d at p. 478; accord, *Valenti, supra,* 987 F.2d 708, 714-715 [reading *Gannett, supra,* 443 U.S. 368, 401 [99 S.Ct. 2898, 2916] (conc. opn. of Powell, J.), as placing that burden on those who object to closure]; *Ramos, supra,* 685 N.E.2d 492, 500 [same, construing the high court cases]; *Ayala* v. *Speckard* (2d Cir. 1997) 131 F.3d 62, 70-72 [construing the high court cases and concluding that the trial court has no sua sponte duty to consider alternatives to "partial closure" not proposed by those objecting, and leaving open the question whether the trial court has a sua sponte duty to consider alternatives to "complete closure"].) We shall abide by the majority view that the burden of demonstrating reasonable alternatives to closure rests with the press.

high court in confirming the existence and scope of a First Amendment right of access.

Respondent asserts that the closed proceedings conducted in the present case concerned only "tangential trial matters" such as "discussions concerning the scheduling of witnesses and the time when court will convene or recess" and other "chit chat," and not matters that have been "historically important and open and public parts of criminal or civil trials." The record belies this characterization. As shown above, the closed and sealed hearings concerned, among other things, motions for and arguments of counsel regarding nonsuit and mistrial, evidentiary hearings conducted pursuant to Evidence Code section 402 (at which the court heard the testimony of proffered witnesses), and other proceedings addressing the admissibility of testimony and documentary evidence. We are unaware of any authority holding or suggesting that such proceedings have not been historically important, open, and public parts of civil trials.[41]

Furthermore, under the case law described above, public access plays an important and specific structural role in the conduct of such proceedings. Public access to civil proceedings serves to (i) demonstrate that justice is meted out fairly, thereby promoting public confidence in such governmental proceedings; (ii) provide a means by which citizens scrutinize and check the use and possible abuse of judicial power; and (iii) enhance the truthfinding function of the proceeding. (See, e.g., *Publicker, supra,* 733 F.2d 1059, 1070.)

Respondent contends otherwise, asserting that contemporaneous access to proceedings held outside the presence of the jury "does not significantly enhance" the public's ability to "assure proper functioning of the courts," and that the utilitarian values described above are adequately furthered by a procedure under which sealed transcripts are released only after the trial is completed.[42] No case supports either of these propositions. Of the various values supporting public access to civil proceedings, only one—enhancing truthfinding by promoting the accuracy of witness testimony—may in some circumstances be less significant with regard to proceedings held outside the

---

[41]Indeed, the proceedings here at issue fall outside the statutory list of matters that may be addressed "in chambers." (See *ante,* fn. 12, describing Code Civ. Proc., § 166.)

[42]In a related argument, respondent asserts that "[d]elaying media access to matters held outside the presence of the jury until conclusion of the trial is not a prior restraint warranting exacting First Amendment scrutiny." Although the trial court did not impose a prior restraint on the publication of information, it did close the courtroom and temporarily seal the hearing transcripts, thereby precluding access to information in the first instance. Under the authority discussed, *ante,* part II C, the latter acts clearly are subject to "exacting First Amendment scrutiny."

presence of a jury. And yet, as demonstrated by the record of the underlying trial, even that value is implicated in nonjury proceedings when, for example, and as occurred below, witnesses are called to testify pursuant to Evidence Code section 402.[43] Additionally, as observed in *Richmond Newspapers, supra,* 448 U.S. 555, "[i]n advancing [the policies discussed in the cases], the availability of a trial transcript is no substitute for a public presence at the trial itself. As any experienced appellate judge can attest, the 'cold' record is a very imperfect reproduction of events that transpire in the courtroom. Indeed, to the extent that publicity serves as a check upon trial officials, '[r]ecordation . . . would be found to operate rather as cloa[k] than chec[k]; as cloa[k] in reality, as chec[k] only in appearance.' [Citations.]" (*Id.,* at p. 597, fn. 22 [100 S.Ct. at p. 2838] (conc. opn. of Brennan, J.), brackets and ellipsis in original); see also *Nebraska Press, supra,* 427 U.S. at p. 561 [96 S.Ct. at pp. 2803-2804]; *U.S.* v. *Simone* (3d Cir. 1994) 14 F.3d 833, 842; *Charlotte Observer, supra,* 882 F.2d 850, 856.)[44]

---

[43]In support of its broad proposition that access to proceedings held outside the presence of the jury does not significantly enhance the public's ability to monitor the functioning of the courts, respondent cites *In re Reporters Comm. For Freedom of the Press* (D.C. Cir. 1985) 773 F.2d 1325, 1337, footnote 9 [249 App.D.C. 119] (*Reporters Committee*), in which the court asserted that "[c]ontemporaneity of access to *written material* does not significantly enhance" the public's ability to ensure proper functioning of the courts. (Italics added.) *Reporters Committee* did not concern closed proceedings, but instead sealed discovery documents from a nonparty witness that were used in connection with summary judgment and trial proceedings. Indeed, the majority in *Reporters Committee* expressly distinguished the sealing of documents from the closure of proceedings. (*Id.,* at p. 1337.) In any event, courts in subsequent decisions have declined to follow the reasoning and approach of the *Reporters Committee* decision with regard to documents filed in connection with a summary judgment motion. (See *Republic of Philippines* v. *Westinghouse Elec.* (D.N.J. 1991) 139 F.R.D. 50, 59 ["To the extent that [*Reporters Committee*] holds that there was no constitutional right of access to certain discovery materials filed in connection with cross motions for summary judgment that were denied, its analysis of the presumption of access is inconsistent with the approach of the Third Circuit and the other decisions cited herein."]; see also, e.g., *Rushford, supra,* 846 F.2d 249, 252-253 [First Amendment applies to documents filed in connection with summary judgment motion in civil case]; *Continental Illinois Securities, supra,* 732 F.2d 1302, 1308-1309; *Brown & Williamson, supra,* 710 F.2d 1165, 1177-1180.)

[44]For similar reasons, we reject two related assertions. Respondent claims that "if the trial court was too broad in its initial exclusion" and "if matters that did not justify exclusion were ultimately discussed," this problem was rectified by the circumstance that "the transcript would shortly be released in its entirety, providing full access to all that was discussed." In addition to placing unwarranted weight on the availability of transcripts, the suggested approach plainly would condone routine violation of the high court's clear requirement that closure be narrowly tailored in the first instance. Respondent also asserts that barring the public and the press from proceedings conducted in the courtroom outside the jury's presence actually might *enhance* "public and media scrutiny," because "the press and the public may be motivated to read carefully what they were initially denied access to." Respondent cites no authority that would approve closure of proceedings of the type here at issue on this novel theory, which is fundamentally inconsistent with the basic value of a right of access.

In a related argument, respondent asserts that "contemporaneous access to the conferences in question in the proceeding could undermine their very function" in two ways: such access might (i) increase "the risk that jurors will be exposed to the very information that was held from them," and (ii) discourage or impair "the necessary give-and-take negotiations between counsel and the court that such conferences are designed to engender."

Regarding the first point, although it is readily apparent that publicity poses a risk of prejudice to the fairness of a trial (cf. *Press-Enterprise II, supra,* 478 U.S. 1, 14-15 [106 S.Ct. 2735, 2743-2744]), as noted above and elaborated upon *post,* footnotes 50 and 51, frequent and specific cautionary admonitions and jury instructions, and not closure, constitute the accepted, presumptively adequate, and plainly less restrictive means of dealing with the threat of jury contamination.

As to the second point, respondent does not explain its assertion that the matters addressed in the closed proceedings required "give-and-take negotiation between the court and counsel that can be inhibited by contemporaneous access."[45] *McDonald, supra,* 49 F.3d 294, upon which respondent relies, is inapposite. That case, unlike the present one, concerned posttrial, nonadjudicatory proceedings in the nature of true give-and-take negotiations, i.e., *implementation* of a consent decree—a proceeding that has not been historically open and a matter as to which (the court in *McDonald* explained in detail) access would impede rather than assist the conduct of the proceeding. (*Id.,* at pp. 299-301.) Respondent advances nothing in support of the proposition that access would hinder proceedings in which a court (as below) entertains, among other things, motions for mistrial or nonsuit, or conducts hearings under Evidence Code section 402 at which the proffered testimony of witnesses is given.

We conclude that the considerations used by the high court—historical tradition and specific structural utility—support a finding that First Amendment scrutiny is triggered by the closure of the civil proceedings below.

---

[45]The sole example provided by respondent does not support its position. Early in the closed proceedings, plaintiff's counsel advised the court that she viewed opposing counsel's remarks concerning litigation tactics as an attack on her own professional reputation. The trial court advised plaintiff's counsel that the court was not "excited" about the matter and neither need counsel be. Thereafter, as respondent observes, the court reminded counsel, "I've made it so we can have these discussions that we can say anything we want, and there's no press here. There's nobody else here. That's why we do it that way." The described event and the resulting quoted comment do not support respondent's blanket assertion that the closed proceedings concerned matters that "require[d] a certain degree of give-and-take negotiation"; instead, they reflect simply an everyday example of courtroom posturing between advocates.

2

We believe that the trial court's stated justification—protection of the underlying civil litigants' right to a fair trial—is, in the abstract, an overriding interest, and that the First Amendment (and hence section 124) do, in an appropriate case, permit closure to protect that interest.[46] The trial court, however, made no finding supporting the proposition that prejudice to that interest was *substantially probable* absent closure and temporary sealing.[47] Moreover, although our review of the transcripts of the closed hearings

[46]As observed, *ante*, at page 1207, the court in *Press-Enterprise II, supra*, 478 U.S. 1, 14 [106 S.Ct. 2735, 2743], implied that an accused's interest in a fair trial constitutes an "overriding interest" supporting closure. We assume that the high court similarly would find that a civil litigant's right to a fair trial also constitutes an overriding interest supporting closure.

Courts have acknowledged various other overriding interests. (*Globe, supra*, 457 U.S. 596, 607 [102 S.Ct. 2613, 2620] [protection of minor victims of sex crimes from further trauma and embarrassment]; accord, *Press-Enterprise II, supra*, 478 U.S. 1, 9, fn. 2 [106 S.Ct. 2735, 2741]; *Press-Enterprise I, supra*, 464 U.S. 501, 512 [104 S.Ct. 819, 825] [privacy interests of a prospective juror during individual voir dire]; *Rovinsky, supra*, 722 F.2d 197, 200 [protection of witnesses from embarrassment or intimidation so extreme that it would traumatize them or render them unable to testify]; *Publicker, supra*, 733 F.2d 1059, 1073 [protection of trade secrets, protection of information within the attorney-client privilege, and enforcement of binding contractual obligations not to disclose]; Comment, *The First Amendment Right of Access to Civil Trials After Globe Newspaper Co. v. Superior Court, supra*, 51 U. Chi. L.Rev. at pp. 299-310 [safeguarding national security, ensuring the anonymity of juvenile offenders in juvenile court]; Fenner & Koley, *supra*, 16 Harv. C.R.-C.L. L.Rev. at pp. 440-444 [ensuring the fair administration of justice, and preservation of confidential investigative information].)

Quite apart from questions relating to closure based upon the content of information, it is recognized that courtroom access may be denied or regulated by reasonable "time, place, and manner restrictions" in order to maintain dignity and decorum, or when courtroom capacity precludes entry by every person who wishes to attend. (*Richmond Newspapers, supra*, 448 U.S. 555, 581, fn. 18 [100 S.Ct. 2814, 2830] (lead opn.); Fenner & Koley, *supra*, 16 Harv. C.R.-C.L. L.Rev. at pp. 444-446.)

[47]The record suggests reason to question whether there was a "substantial probability" of prejudice to the litigants' fair trial rights, and whether it was substantially probable that "closure would prevent" such publicity. (See *Press-Enterprise II, supra*, 478 U.S. 1, 14 [106 S.Ct. 2735, 2743].) Petitioner KNBC asserts that "many of the *facts* discussed in the courtroom outside the presence of the jury . . . already were known to the press and (if newsworthy) had been published; thus there was little if any reasonable prospect that the presence of the public in the courtroom could have exposed the jurors to prejudicial information beyond what was already public knowledge." (Italics in original.) Indeed, as the record reveals, some of the most sensitive of the information sought to be suppressed and kept from dissemination by the media—allegations of a compelled abortion—was in fact prominently reported by petitioners Los Angeles Times and KNBC on or before the morning of Monday, September 16, 1996, well before plaintiff finished presenting her case (see *ante*, fn. 4), and hence the closure order did not, in fact, prevent the kind of publicity that the court sought to forestall. (See *Ex parte First Charleston Corp.* (1998) 329 S.C. 31 [495 S.E.2d 423, 425] ["the record does not support a finding of a substantial probability of prejudice from publicity [concerning a bail bond hearing] since extensive details had already been disclosed in the press regarding the defendant and the crime with which he was charged"].)

reveals nothing that, if conducted in the open courtroom, would have irremediably infected the jury and deprived the litigants of a fair trial,[48] even assuming that closure and temporary withholding of transcripts might have been appropriate as to some or part of the proceedings that were conducted in the jury's absence, the trial court's blanket and sweeping order closing the courtroom during *all* nonjury proceedings was not narrowly tailored: the trial court wholly failed to identify particular proceedings that would or did contain information justifying closure.

Finally, in this case there were less restrictive means, short of closure, of achieving the overriding interest in a fair trial. Respondent asserts that when, as was evidently the situation in the underlying trial, there is intense and pervasive media coverage of proceedings, "[i]nstructions to disregard press accounts or sequestration of the jury are not adequate reasonable alternatives to briefly delaying public access to conferences held outside the presence of the jury in civil proceedings; briefly delaying release of the transcripts of such conferences is a reasonable and practical time, place and manner restriction." On both counts, we disagree.

We must presume that jurors generally follow instructions to avoid media coverage, and to disregard coverage that they happen to hear or see. As we observed in the context of an appeal in a capital case in which jurors were exposed to press coverage of nonjury proceedings, "[a]bsent a contrary indication in the record, it must be assumed the jury followed its instruction to avoid all publicity in the case." (*People* v. *Pride* (1992) 3 Cal.4th 195, 226 [10 Cal.Rptr.2d 636, 833 P.2d 643].) We repeatedly have stressed our adherence to the fundamental premise that, as a general matter, cautionary admonitions and instructions serve to correct and cure myriad improprieties, including the receipt by jurors of information that was kept from them. To paraphrase Justice Holmes, it must be assumed that a jury does its duty,

---

[48]As noted above, the trial court at one point stated: "We have had [Evidence Code section] 402 hearings where a person makes an unsubstantiated statement that borders on slander. That would be unbelievably prejudicial to a jury, and we would know that that would come out in every one of the tabloids. . . ." We have reviewed the two hearings conducted below pursuant to Evidence Code section 402 and have found no such statement by either witness. It is possible that the trial court was referring to its experience outside the underlying trial with respect to other proceedings under Evidence Code section 402.

Also, as noted above, on the morning after the Court of Appeal issued its writ of mandate, the trial court held a closed chambers session to address a "procedural motion" concerning a defense expert witness, but the court made no finding concerning why the motion needed to be heard in chambers, outside the presence of the public and the press. Nor does the transcript of that hearing reveal any information that reasonably may be viewed as tending to influence the jury, had the information somehow become known to the jury. The record reveals, instead, typical discussion concerning unexceptional procedural matters. We similarly characterize the vast majority of the closed proceedings.

abides by cautionary instructions, and finds facts only because those facts are proved. (*Aikens* v. *Wisconsin* (1904) 195 U.S. 194, 206 [25 S.Ct. 3, 6, 49 L.Ed. 154].) Consistent with this premise, courts have held that, as a general matter, cautionary admonitions and instructions must be considered a presumptively reasonable alternative—a presumption that can be overcome only in exceptional circumstances. (*Times-World, supra,* 373 S.E.2d 474, 479-480; *Oliver* v. *Postel* (1972) 30 N.Y.2d 171 [331 N.Y.S.2d 407, 282 N.E.2d 306, 311]; see also *Waller, supra,* 467 U.S. 39, 47, fn. 6 [104 S.Ct. 2210, 2216].)[49]

In a given case, the presumption that admonitions and instructions are adequate may be rebutted by the exceptionally prejudicial nature of evidence to be received outside the presence of the jury and the potential intensity of media coverage. In such a case, narrowly tailored closure—supported by sufficient findings, made after notice and a hearing, and coupled with prompt release of transcripts—might be necessary and, therefore, proper to guarantee a fair trial. The record in the case before us, however, does not support respondent's position that frequent and specific admonitions and instructions,[50] coupled with careful voir dire of the jurors and/or other measures,[51] would not have constituted an adequate and less restrictive alternative to closure of all the proceedings that were held outside the

---

[49]The trial court below (see, e.g., *ante,* at pp. 1184-1185 & fn. 1) characterized its stated goal as *"ensur[ing]"* that the jurors do not hear" prejudicial material that may be published by the media (italics added), and suggested that because cautionary instructions cannot guarantee that jurors will not learn of excluded or otherwise inadmissible information, such instructions always are inadequate, at least in cases with saturated media coverage. Neither the high court cases, nor their progeny discussed above, suggest that closure is appropriate merely because standard alternatives short of closure (such as cautionary admonitions and instructions) cannot be *guaranteed* to preclude jurors from learning of inadmissible material.

[50]Reviewing courts have stressed the need for trial courts to do more than merely instruct the jury to "disregard" or "pay no attention to" media accounts of the case, and instead have encouraged the giving of instructions that specifically direct the jury not to read or listen to media accounts of the case. (*U.S.* v. *Bermea* (5th Cir. 1994) 30 F.3d 1539, 1559 (*Bermea*); *United States* v. *Harrelson* (5th Cir. 1985) 754 F.2d 1153, 1163 (*Harrelson*).) The court in *Bermea* also stressed the need for frequent formal admonitions and instructions (*Bermea, supra,* 30 F.3d at p. 1559) and, like the court in *Harrelson,* suggested that trial judges regularly should poll the sitting jury to inquire whether any member has been exposed to media coverage concerning the case. (*Bermea, supra,* at p. 1559; *Harrelson, supra,* 754 F.2d at pp. 1163-1164; see also *U.S.* v. *Aragon* (5th Cir. 1992) 962 F.2d 439, 445-446 [trial court should make "daily pointed inquiry whether the jury knew or had heard anything relating to the case other than the evidence presented at trial"]; cf. Pen. Code, § 1122 [admonitions to jury]; Code Civ. Proc., § 611 [same].)

[51]As suggested in *Bermea, supra,* 30 F.3d 1539, a trial court alternatively might instruct the jury to avoid *all* external media, except that provided by the court "with any relevant portions redacted." (*Id.,* at p. 1559; see also *Harrelson, supra,* 754 F.2d at p. 1163.) In this regard, the court in *Harrelson* approved the following "repeatedly delivered" instructions: " '[I]n this particular case, there will continue to be extensive television, radio and possible newspaper coverage. *You're instructed that you are not . . . to listen to any television or radio news*

presence of the jury.[52] Finally, it never has been suggested by the high court, or held by any court decision of which we are aware, that the blanket closure of courtroom proceedings held outside the presence of the jury coupled with delayed release of the transcripts of those proceedings, is justified as a reasonable time, place, and manner restriction.[53]

The trial court did not make, nor would the record support, a finding that the traditional means of countering inadmissible, prejudicial information—regular and specific cautionary jury admonitions and instructions—did not constitute an adequate and less intrusive means of accomplishing the goal of ensuring a fair trial. In the absence of a finding concerning less restrictive alternatives, we are left merely with the trial court's generalized conjecture that the jurors might violate their oaths and allow themselves to be exposed to press coverage, and that their deliberations might be tainted irreparably by that exposure. But as the high court made clear in *Press-Enterprise II, supra,* 478 U.S. 1, 15 [106 S.Ct. 2735, 2743], "The First Amendment right of access cannot be overcome by the conclusory assertion that publicity *might* deprive the defendant of [a fair trial]." (Italics added.)

It is apparent from the record before us that the trial court's closure and sealing order fails to meet the minimum requirements imposed by section 124, as interpreted in light of the requirements of the First Amendment.

---

*commentary or news broadcasts, and you will not . . . , except under the direction of the Court, review any newspaper nor read any newspaper at all.* The Marshals will have [news]papers prepared for you that will have any reference to this particular case or other cases that are involved stricken, so that you can read it without having to worry about getting any information from any other source. This is important to you and important to the Court.' . . . 'If you know of or learn anything about this case or any other case where you may be going to trial, except from the evidence that is admitted during the course of the trial, you should tell the Court about it at once.' " (754 F.2d at pp. 1163-1164, italics in original, fn. omitted.)

[52]Sequestration is another alternative, albeit one that appropriately is used only sparingly. As noted above, the trial court stated at the closure hearing that it would consider sequestration as an alternative to closure if the press would finance the sequestration. Respondent asserts that a trial court should be free to consider the economic cost to the taxpayers in its "less restrictive means" calculus. We need not decide whether this is so, because, as explained above, the record fails to establish that the presumptively adequate alternative of regular and specific cautionary instructions was not in fact an adequate and less restrictive option in this case.

[53]The passage of the lead opinion in *Richmond Newspapers, supra,* 448 U.S. 555—upon which respondent relies for its "time, place, and manner" analogy—addresses only reasonable restrictions necessary to maintain courtroom decorum and to resolve problems relating to seating capacity (*id.,* at p. 581, fn. 18 [100 S.Ct. at p. 2830]). That high court opinion does not suggest that a trial court properly may order blanket closure of courtroom proceedings conducted outside the presence of the jury together with delayed release of the transcripts of those proceedings.

## B

Respondent asserts that "[r]equiring individualized justification as to each matter to be discussed during the non-jury conferences, with notice to the press of intention to exclude them, permitting a hearing thereon, and presumably appellate review thereof by extraordinary writ, squanders scarce judicial resources to secondary due process trials." Respondent's concerns are misplaced and overstated.

The decisions of the United States Supreme Court and numerous lower courts establish that notice is required in order for substantive trial or chambers proceedings to be closed in a manner comporting with the Constitution but, as observed, *ante,* footnote 36, and contrary to respondent's assertion, no special "notice to the press" generally is required. As explained, *ante,* pages 1216-1217, the notice requirement will not impose an undue burden on trial courts.

The need to comply with the requirements of the First Amendment right of access may impose some burdens on trial courts. But courts can and should minimize such inconveniences by proposing to close proceedings only in the rarest of circumstances, as explained above. Accordingly, the burden imposed by requiring trial courts to give notice of a closure hearing and make the constitutionally required findings, and the ensuing burden imposed by permitting review of closure orders by extraordinary writ, will not unduly encumber our trial or appellate courts.

## IV

The judgment of the Court of Appeal issuing a writ of mandate directing the trial court to vacate its September 12, 1996, closure order, is affirmed.

Mosk, J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.